Opinion issued August 30, 2012



In The

# Court of Appeals

For The

# First District of Texas

——————————

## NO. 01-11-00147-CR

——————————

## LARRY BRUCE WILEY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 228th District Court
Harris County, Texas
Trial Court Case No. 1238444

# O P I N I O N

Appellant Larry Bruce Wiley was convicted, after a bench trial, of possession of cocaine in an amount more than 4 grams and less than 200 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (a), (d) (West 2010). He

pleaded true to two enhancement paragraphs that alleged prior felony convictions, and the trial court sentenced him to 25 years in prison. *See* TEX. PENAL CODE ANN. § 12.42(d) (West Supp. 2012). On appeal, Wiley challenges the sufficiency of the evidence and the trial court's denial of his motion to suppress evidence. We affirm.

## Background

Houston Police Department Officers A. Robles and K. Wagner went to a part of Houston known for narcotics activity to serve felony warrants. It was approximately 10:45 p.m., and it was dark. The officers saw a person leaning into the open window of a parked vehicle. The man put his hand into the vehicle through the window and then removed it. Robles believed he had witnessed a drug transaction, and he pursued the suspect on foot. Wagner followed them in the patrol car.

During the foot-chase, Robles saw the suspect throw something to the ground, and he saw another man, appellant Wiley, walk towards it. After a chase of approximately 200 yards, Robles apprehended the original suspect, and Wagner took custody of him.

Robles walked back toward the spot where he saw an object thrown to the ground, and he saw Wiley "looking like he was bending down to pick something up." Robles testified, "I saw the defendant [Wiley]—looked like he had picked

2

something up. And he looked back and saw me and then went and turned away from me like he was attempting to conceal or hide something he had just picked up." Robles then detained Wiley on the suspicion that he had picked up narcotics or tampered with evidence.

Robles asked Wiley if he lived nearby. Wiley responded that he did not, and he also stated that he had gotten a ride from a friend. In response to Robles's inquiry, Wiley said he did not have a car. After Wiley provided his name, birthdate, and address, Robles determined that there was a warrant for his arrest, and he placed him under arrest. He then found that Wiley had a set of car keys and a wad of money, more than $2,000, mostly in $20 bills.

As they drove away in the patrol car, Robles pushed the car alarm button on Wiley's keys. Less than a block from where the arrest took place, a car alarm went off. The car was legally parked on a public street. The officers stopped beside the car, checked the license plate, and determined that it was registered in Wiley's name. They approached the car and used their flashlights to look through the windows. They saw what they believed to be crack cocaine and cocaine in plain view on the rear seat side of the car. They opened the car door, retrieved the suspected narcotics, and conducted a field test, which was positive for cocaine. Then they had the car towed.

Wiley was charged with possession of cocaine. Before trial, his attorney filed a motion to suppress, which argued:

> The defendant was stopped because the officers claim in their report that they observed the defendant picking up something from the street that may have been thrown down by a suspect they were chasing. Then they arrested him for an outstanding warrant. Then they found his car and searched it. The search of his car violated the 4th Amendment of the U.S. Constitution and the Texas Constitution. Therefore the defendant moves this [sic] matters be suppressed.

At trial, Wagner and Robles testified about the events that led up to Wiley's apprehension and arrest. As to his use of the alarm button to locate Wiley's car, Robles testified that when his search of Wiley revealed keys to a vehicle, his suspicion was aroused because Wiley had told him that he did not have a car, not that he simply had not driven his car that night.

Two witnesses who testified on Wiley's behalf said that three other people had used the car that day. Wiley's cousin testified there was a block party in progress that night, that more than 200 people attended, and that there was a lot of traffic on the street. She testified that Wiley did not drive his car that night, rather, three other cousins had driven it to the party. A lifelong friend of Wiley's also testified that she was at the block party and witnessed the events that led to Wiley's arrest. She testified that Wiley had two cars, that he did not drive the car in which the drugs were found on the night of the party, and that his three cousins, who drive that car "most of the time," drove it that night. On cross-examination, she

4

conceded that she saw Wiley only approximately twice a week and she did not really know how often he drove the car. She also admitted that she had prior criminal convictions for a felony drug offense and for forgery.

Officer Wagner conceded that he did not know who else had access to Wiley's car and he never saw Wiley in possession of the car in which the cocaine was found. Officer Robles testified that he found no evidence in the car that indicated that anyone other than Wiley had been in it.

The trial court did not rule on the motion to suppress before the bench trial. After the close of evidence and as part of closing argument, Wiley presented arguments on his motion to suppress evidence. He argued that Robles did not have reasonable suspicion sufficient to justify his initial stop nor was his detention reasonable. Wiley argued that the officers' use of the remote car alarm to locate his car was unreasonable because they did not have a search warrant and that it was unlikely that the narcotics were in plain view because it was dark outside. Finally, he argued that the State had not shown that the narcotics in the car were his.

The trial court overruled the motion to suppress. The trial judge explained how he viewed the evidence pertinent to the motion to suppress:

> It's my understanding and maybe I'm wrong, but it's my understanding that they come upon the scene and indicated—indicated that they observed something that appeared to be a narcotics transaction. They were in a high-narcotics area. And so, when they stopped to get out, the fellow who was standing . . . took off running.

5

And even he admitted he was smoking a marijuana cigarette and threw it down on the ground.

And you're right, Officer Wiley [sic] said he saw the defendant come over. And he thought he may have been picking up something. He went back to the scene and couldn't find anything that was thrown on the ground. And then he said he went back and I think Wiley was behind the vehicle and he did make some move or something. I don't know. But anyway, he went up to Wiley. And at that particular point in time in order to find out what was going on, he patted him down and found the large roll of money in his pocket, which I guess is consistent with people that—that kind of sell drugs. I'm just saying that that's—that's what he found.

And then after finding out his name, they just ran the warrants and found out that he did have some warrants. And then I guess that's when they took everything out of his pockets and placed him inside the patrol car. And then he had the keys and they activated the car through the remote and found the—and found the automobile. And then they found the drugs in the back seat. That's the way I remember the testimony from basically trying to put everything together.

Wiley was found guilty, and after he pleaded true to two enhancement allegations, the trial court sentenced him to 25 years in prison. Wiley appealed.

## Analysis

### I. Sufficiency of the evidence

In his first issue, Wiley contends that the evidence was insufficient to prove that he possessed the drugs found in the car because there was "no evidence that [he] had any contact with the vehicle or even knew where it was located." Wiley argues that he was never seen in physical contact with the car, there was no

6

evidence when he was last in contact with the car, and defense witnesses testified that three other people had driven the car that night.

When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this is the function of the trier of fact. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

A person commits a second-degree felony by knowingly or intentionally possessing cocaine or crack cocaine in an amount greater than four grams but less than 200 grams. TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.115(a), (d) (West 2010). "'Possession' means actual care, custody, control or management." *Id*. § 481.002(38). To prove that Wiley possessed the cocaine, the State was required to show that he exercised actual care, custody, control, or management over the cocaine; that he was conscious of his connection to it; and that he knew what it was. *See Blackman v. State*, 350 S.W.3d 588, 594 (Tex.

7

Crim. App. 2011); *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *see also* TEX. PENAL CODE ANN. § 6.03 (a), (b) (West 2011) (defining intentionally and knowingly).

Possession need not be exclusive. *McGoldrick v. State*, 682 S.W. 2d 573, 578 (Tex. Crim. App. 1985); *Woodard v. State*, 355 S.W.3d 102, 110 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When the accused is not in exclusive possession of the place where the controlled substance is found, a trier of fact cannot conclude that the accused knowingly possessed the controlled substance unless additional, independent facts and circumstances affirmatively link the accused to the controlled substance. *Blackman*, 350 S.W.3d at 594–95 (citing *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005)); *Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). That is, the evidence "must establish, to the requisite level of confidence, that the accused's connection with the [contraband] was more than just fortuitous." *Brown*, 911 S.W.2d at 747. "This rule simply [states] the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the contraband found in that house." *Poindexter*, 153 S.W.3d at 406.

Links that may establish the sufficiency of the evidence to prove knowing possession include (1) the defendant's presence when a search is conducted;

(2) whether the substance was in plain view; (3) the defendant's proximity to and the accessibility of the substance; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the substance was found; (12) whether the place where the substance was found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

The State is not required to prove all of these factors, and the "number of . . . links proven is not as important as the logical force that they collectively create." *Hubert v. State*, 312 S.W.3d 687, 691 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Moreover, "[t]he absence of various affirmative links does not constitute evidence of innocence to be weighed against the affirmative links present." *James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

Many links are present in this case. The cocaine was found in plain view in a car that was registered in Wiley's name and parked on a public street in an area known for narcotics activity. In addition to the narcotics, the officers found paperwork with Wiley's name on it inside the car. The car was parked less than a block away from where the police officers stopped and apprehended Wiley, on the same street where the officers witnessed the initial hand-to-hand drug transaction. When Wiley was stopped, he had a large amount of cash—more than $2,000, mainly in $20 bills. Wiley made furtive gestures when Robles initially approached him, turning away after spotting Robles, "like he was attempting to conceal or hide something he had just picked up."

Wiley was not under the influence of narcotics or in possession of narcotics when he was stopped. There was no odor of contraband, nor was there any drug paraphernalia present. Although Wiley did not make any facially incriminating statements, he denied having a car in the vicinity when his car was, in fact, less than a block away from where Robles stopped him. This denial could suggest some consciousness of guilt. Although the State did not introduce evidence that Wiley tried to flee, when the court inquired about the initial detention of Wiley, Robles testified, "He—he tried to walk away and I stopped him." And though the cocaine was not within Wiley's immediate reach, it was half a block away, in his car, and he was carrying the car's keys.

10

Wiley contends that the evidence was not sufficient because two defense witnesses testified that three other people had driven his car that day and because there was no evidence as to when he was last in contact with the car or how many sets of keys existed. Wiley argues that it was impossible to determine whether he had custody and control over his car, and his possession of the keys was insufficient because there was no direct evidence as to when he was last in the car. But direct evidence of these matters is not required to sustain a conviction. Indeed, the "affirmative links" analysis is a way "to explain why the circumstantial evidence in a particular case [is] sufficient for conviction." *Brown*, 911 S.W.2d at 747. In addition, the trial court, as trier of fact, was the sole judge of the credibility of the witnesses and could have disbelieved the defense witnesses' testimony that others had used Wiley's car. *See Dewberry*, 4 S.W.3d at 740. In such a case, there would be no basis for considering Wiley's possession of the car to be shared with others.

Wiley also relies on *Miller v. State*, 627 S.W.2d 235, 237 (Tex. App.—San Antonio 1981, pet. ref'd), for the proposition that evidence that the defendant possessed keys to a car in which contraband is found is insufficient to support a conviction. In *Miller*, the defendant was arrested based on an informant's tip at a time when he was walking toward a car with keys in his hand. *Id.* at 236–37. Here, Wiley was not merely in possession of car keys. He was apprehended in an

area known for narcotics activity, on suspicion of tampering with evidence, with a wad of cash and car keys in his pocket, half a block away from his car in which officers found cocaine, crack cocaine, and paperwork bearing Wiley's name in plain view.

The other authorities upon which Wiley relies are similarly distinguishable because in each case the links between the defendant and the contraband were significantly weaker. *See, e.g.*, *Waldon v. State*, 579 S.W.2d 499, 502 (Tex. Crim. App. 1979) (holding evidence insufficient to connect defendant to marijuana found in camper near private airplane hangar, when he was found in hangar in possession of key to airplane but no evidence indicated he flew airplane that night or in any other way linked him to marijuana found in other vehicle); *Roberson v. State*, 80 S.W.3d 730, 734–36 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (holding evidence that showed only that defendant drove car in which cocaine was found was insufficient to connect him to it, especially in light of his attempts to dissociate himself from passenger, who was high and in possession of PCP at time of arrest); *Lassaint v. State*, 79 S.W.3d 736, 741–46 (Tex. App.—Corpus Christi 2002, no pet.) (holding evidence did not connect defendant to narcotics found in individual bags inside a larger bag in a car following the defendant's car when the only connection was his fingerprints on outer bag, and when the driver and passenger of the car in which the drugs were found exhibited nervousness and other factors

12

indicating consciousness of guilt); *Kyte v. State*, 944 S.W.2d 29, 33 (Tex. App.—Texarkana 1997, no pet.) (holding evidence was insufficient to link defendant to drugs in borrowed vehicle when the drugs were not in plain view, the defendant disavowed knowledge that drugs were hidden in floorboard of car, and a person antagonistic toward defendant's husband had access to the car before she borrowed it).

The logical force of the evidence linking Wiley to the cocaine found in his car shows that his connection to the cocaine was more than just fortuitous, *see Brown*, 911 S.W.2d at 747, and would enable a rational trier of fact to find the essential elements of possession of cocaine beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Drichas*, 175 S.W.3d at 798. We hold that the evidence was legally sufficient and we overrule Wiley's first issue.

## II. Motion to suppress

In his second and third issues, Wiley argues that the court erred by denying his motion to suppress evidence because, he contends, his detention and the officers' action in pressing the alarm button on his car keys were both unlawful.

In reviewing the trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *See, e.g., Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's determinations of historical facts, and we review the application of the law

13

of search and seizure de novo. *See id.* In a hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). "This is so because it is the trial court that observes first hand the demeanor and appearance of a witness, as opposed to an appellate court which can only read an impersonal record." *Id.* "When the trial court does not file findings of fact concerning its ruling on a motion to suppress, we assume that the court made implicit findings that support its ruling, provided those implied findings are supported by the record." *Flores v. State*, 177 S.W.3d 8, 14 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (citing *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002)).

### A. Detention

A police officer may temporarily detain an individual for investigative purposes if he reasonably suspects that the individual is involved in criminal activity. *Foster v. State*, 326 S.W.3d 609, 613 (Tex. Crim. App. 2010) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968)). "Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). It requires

14

more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883. "A reasonable-suspicion determination is made by considering the totality of the circumstances." *Ford*, 158 S.W.3d at 492–93.

Wiley challenges his detention based upon two isolated snippets of testimony from Officer Robles. In both instances, the officer was responding to cross-examination questions that characterized his suspicion about Wiley as a "hunch." In the first instance, Robles had testified that he stopped Wiley to investigate the possibility that he had picked up the object that he had seen thrown to the ground. Robles did not find any evidence that Wiley picked up whatever had been thrown to the ground. Wiley's attorney asked:

> Q.     Okay. And that's really what you were—you were—you had a hunch possibly that Mr. Wiley could have picked something up, right?
>
> A.     Yes, ma'am.

In the second instance, Wiley's attorney was again questioning Robles about what prompted him to approach Wiley. Robles testified that he thought he saw the original suspect throw something and that he thought he saw Wiley approach to pick it up. The attorney asked:

> Q.     You hypothesized. You think that he may have picked up something.
>
> A.     Yes, ma'am.

15

Q.      Okay.  You didn't have any—anything other than your hunch that he may have picked up something.  Would that be fair?

A.      Yes, ma'am.

In arguing that this testimony, standing alone, shows that Robles had an inadequate basis for detaining him, Wiley ignores the officer's prior and subsequent testimony, in which he stated that he was in an area of town known for narcotics activity, he witnessed what he believed, based on his training and experience, to be a hand-to-hand drug transaction, he pursued a suspect on foot, he watched that suspect throw something to the ground, he saw Wiley approach what was thrown to the ground, and Wiley tried to hide when Robles approached him after apprehending the other suspect.  After Wiley's attorney questioned Robles, the trial court asked Robles additional questions about the sequence of events involving the original suspect, named DeVaughn, and Wiley.

Trial court: You were chasing DeVaughn.  And who—who arrested Mr. Wiley?  Who stopped Mr. Wiley?

Robles:     I did.

Trial court: Where was—you brought DeVaughn back to the scene, so to speak?

Robles:     If I recall, I stopped DeVaughn.  And then another officer immediately arrived that took . . . him from me.  And I was worried about what had been thrown.  So, I immediately went back to recover that.

Trial court: Did you go back to the area where it was—

16

Robles:       Yes, sir.

Trial court:  —thrown?  Did you find anything there?

Robles:       No, sir.

Trial court:  Where did you see—where did you next see Wiley?

Robles:       That's where I saw Wiley, in that exact—where I had—

Trial court:  But you said he was leaving the area or going, whatever he was doing.

Robles:       What I recall is he approached the area where I had seen [DeVaughn] throw something.  Then when I came back, it looked like he had gotten—he was picking something up and was going to destroy it or get rid of it or do something with it.

Trial court:  So, the first time you saw Wiley was when you were bringing DeVaughn back?

Robles:       I wasn't bringing DeVaughn.   Someone else had DeVaughn.  I immediately returned.

Trial court:  Okay.  Okay.  And that's when you first saw Wiley?

Robles:       Well, I saw him initially going towards what had been thrown.

Trial court:  Okay.

Robles:       And that's how I recognized him.

Trial court:  And where did you actually detain him at that point?

Robles:       Detained him right there where—where he was.

Trial court:  And where was—

Robles:       He—he tried to walk away and I stopped him.

17

Trial court: You said he went behind a vehicle or something.

Robles: There was a truck. And then as if to hide, he went towards the truck.

Trial court: Okay. But then you went—you detained him—

Robles: Yes, sir.

The trial court did not file written findings of fact, but it did state its reasons for denying the motion to suppress on the record in open court. The trial court reasoned that the officers were in an area known for narcotics activity, that DeVaughn threw a marijuana cigarette to the ground while Robles chased him on foot, that Robles saw Wiley go the area where DeVaughn threw the cigarette, and that Wiley went behind a truck when Robles approached him. To the extent they were found by the trial judge, these facts are supported by the record.

Further, these facts gave rise to reasonable suspicion sufficient to justify Robles's detention of Wiley. An officer's training or experience, combined with permissible deductions based on objective facts, may provide reasonable suspicion to justify a detention. *See Ford*, 158 S.W.3d at 494 (citing *U.S. v. Cortez*, 449 U.S. 411, 419, 101 S. Ct. 690, 695–96 (1981)). Robles saw what he believed, based on his training and experience, to be a hand-to-hand drug transaction, and he watched the suspect throw something from his hand to the ground. He also saw Wiley move toward the object, just after it was thrown. In addition, when Robles approached Wiley, he moved behind a nearby truck and tried to walk away. These

18

facts give rise to reasonable suspicion.  *See also LeBlanc v. State*, 138 S.W.3d 603, 608 n.5 & n.6 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (noting that furtive gestures and nervousness are factors that may give rise to reasonable suspicion). We hold that the trial court did not err by denying the motion to suppress as to the initial detention, and we overrule Wiley's second issue.

**B. Search**

In his third issue, Wiley contends that the officer's use of the alarm button on his car key was unlawful.  Wiley argues that the use of the alarm button to locate his car was not justified as part of a search incident to arrest because he was not within reaching distance of the passenger compartment at the time of his arrest or at the time the officer activated the alarm, and because it was not reasonable to believe the car contained evidence of the offense for which he was arrested. Wiley's argument presupposes that the officer's use of the car alarm button was a search under the Fourth Amendment and then concludes that the search was unlawful because it was warrantless and did not fall within the "search incident to arrest" exception to the warrant requirement.  The State contends that the use of the alarm button was not unlawful because it was not a search at all.

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures.  U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, and effects, against

19

unreasonable searches and seizures, shall not be violated . . . .”); *U.S. v. Place*, 462 U.S. 696, 700, 103 S. Ct. 2637, 2641 (1983); *Gutierrez v. State*, 221 S.W.3d 680, 684–85 (Tex. Crim. App. 2007); *Carmen v. State*, 358 S.W.3d 285, 292 (Tex. App.—Houston [1st Dist.] 2011, pet. ref’d).  Warrantless searches are per se unreasonable unless the State can prove that the search was conducted pursuant to a recognized exception to the warrant requirement.  *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)).  For example, incident to a lawful arrest, a law enforcement officer may conduct a full but reasonable search of a person.  *U.S. v. Robinson*, 414 U.S. 218, 235, 99 S. Ct. 467, 477 (1973); *see McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003); *Rodriguez v. State*, 313 S.W.3d 403, 408 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  Such a search is justified by the need for officer safety and preservation of evidence.  *Robinson*, 414 U.S. at 235, 99 S. Ct. at 477.  As explained by the United States Supreme Court:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.  A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.  It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a “reasonable” search under that Amendment.

20

*Id.*

Wiley was lawfully arrested pursuant to an outstanding warrant for his arrest. On appeal he does not challenge the lawfulness of the officer's search of his person incident to that arrest or the officer's seizure of his car keys. Rather, he argues only that the officer's subsequent use of the alarm button was itself an unlawful search and that the court therefore should have suppressed the evidence found in his car.

A defendant seeking to suppress evidence based on an alleged violation of the Fourth Amendment must show that the challenged search violated his reasonable expectation of privacy or involved an unreasonable physical intrusion on a constitutionally protected area for the purpose of obtaining information. *U.S. v. Jones*, 132 S. Ct. 945, 950–53 (2012). In *Jones*, the Supreme Court held that the reasonable-expectation-of-privacy test introduced by Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967), supplemented but did not supplant the common law trespassory test for violation of a defendant's Fourth Amendment rights. *Jones*, 132 S. Ct. at 952.

After *Jones* was decided, the Eighth Circuit Court of Appeals considered whether an officer's use of a keyless entry device on the defendant's key fob to locate his car was an unreasonable search under the Fourth Amendment. *U.S. v. Cowan*, 674 F.3d 947, 955 (8th Cir. 2012). The court first observed that the

21

defendant did not have a reasonable expectation of privacy in the identity of his car. *Id.* The court rejected the defendant's assertion that his privacy interest was in the electronic code, because "[t]he officers did not attempt to discover the code." *Id.* The court stated, "Pressing the alarm button the key fob was a way to identify the car and did not tell officers anything about the fob's code or the car's contents." *Id.* Finally, the court explained that the use of the key fob was not a physical intrusion on a constitutionally protected area for the purpose of obtaining information because the officer had lawfully seized the keys pursuant to a search warrant and because "the mere transmission of electric signals alone is not a trespass." *Id.* at 956 (citing *Jones*, 132 S. Ct. at 953 ("Situations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis.")).

Wiley's vehicle was parked on a public street. He had no reasonable expectation of privacy in the identity of his car. *See Cowan*, 674 F.3d at 955. Pressing the alarm button on his car key and activating the car's alarm revealed only that the keys found on Wiley matched the car parked nearby. *See id.* As in *Cowan*, Wiley has not shown how the use of the car alarm button violated a reasonable expectation of privacy in the encrypted code, which the officers did not attempt to discover. *See id.* Thus, we conclude that the use of the alarm button to locate Wiley's car did not violate the Fourth Amendment under the *Katz*

22

reasonable-expectation-of-privacy test because Wiley did not show that he had a reasonable expectation of privacy that was invaded by the officer's actions. *See Jones*, 132 S. Ct. at 950–53.

Because Wiley does not contest that the officer lawfully possessed his keys as a seizure incident to his arrest, our conclusion that simply pressing a button to identify the associated car did not constitute a "search" for Fourth Amendment purposes is determinative of the issue on appeal. We hold that the trial court did not abuse its discretion by denying the motion to suppress on this basis, and we overrule Wiley's third issue.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Bland, Massengale, and Brown.

Publish. TEX. R. APP. P. 47.2(b).

23