**Opinion issued July 7, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00268-CR

————————————

**TONI TAVAREZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1450059**

---

## MEMORANDUM OPINION

A jury convicted appellant Toni Tavarez of felony murder in the death of her youngest child, Y.T., who was 19 months old when she died. *See* TEX. PENAL CODE § 19.02(b)(3). The underlying felony was causing "injury to a child." *See* TEX. PENAL CODE § 22.04. The jury assessed punishment at 50 years in prison.

Tavarez appealed, arguing that the evidence was legally insufficient to show that she caused Y.T.'s death and the jury charge erroneously failed to instruct the jury that it could disregard her confession if it found that her statement was involuntary.

We affirm.

## Background

Toni Tavarez was a young mother of four children ranging from 19 months to five years old at the time of the events relevant to this tragic case. The father of the children lived in Mexico. Tavarez and her children lived with her boyfriend, Marc Teal, in a house next door to her mother and stepfather's house.

On a Friday before Father's Day, all four children attended their cousin's birthday party at their aunt's house. Their aunt testified that she saw a bruise near Y.T.'s left eye, but the child was otherwise healthy and behaved normally.

The next day, Teal, Tavarez, and the children had a barbeque to celebrate Father's Day early, and Y.T. again behaved normally. On Father's Day, Tavarez's stepfather recalled seeing a bump on Y.T.'s head, and Tavarez's mother recalled seeing a bruise near Y.T.'s temple, but both said Y.T. was running, playing, and otherwise behaving normally. Teal also testified that Y.T. behaved normally throughout the weekend, and he did not recall her having any accidents or injuries.

On Monday, Teal left home for work just before 4:00 a.m., as was his routine. He took the couple's only car, leaving Tavarez home alone with her

2

children. When he came to the house around 2:00 p.m. on his lunch hour, Y.T. and another child were napping. Tavarez took the car to the grocery store to purchase a few items for dinner, while Teal remained at the house with all four children. Y.T. was still asleep when Tavarez finished shopping around 2:30 p.m., and Teal returned to work.

When Teal returned home from work around 4:30 p.m., Tavarez was asleep on the couch in the living room, and the three oldest children were playing with water guns inside the house. Teal helped them refill their water guns in the bathroom adjacent to the children's bedroom. The door to the bedroom was open, and he saw Y.T. lying on the bed and assumed that she was napping. Teal went outside to play with the children. About 30 minutes or an hour later, the five-year-old went to the bathroom to refill her water gun. A few minutes later, Teal heard the five-year-old tell Tavarez that something was wrong with Y.T.: she could not sit up. Teal immediately came back inside.

Teal testified that Y.T. looked overheated, dazed, and "bobblehead-ish." Tavarez attempted to rouse Y.T. by taking her into the shower, but the baby vomited a dark brown material and did not awaken. Teal and Tavarez decided to take the child to the hospital. Because they lived in a rural area, Teal believed they would arrive at the hospital faster if he drove them than if they waited for an ambulance. On the way to the hospital, Y.T. began having seizures. The hospital

determined that Y.T.'s skull was fractured and she was bleeding internally. She was transferred by helicopter to Children's Memorial Hermann Hospital. Two days later, Y.T. died from severe skull and brain injuries.

About a week after Y.T.'s death, Tavarez went to the police station to offer a recorded statement. She was not under arrest, and she agreed at the beginning of her recorded statement that she was there voluntarily. For several hours, Tavarez repeatedly insisted that she had no idea what could have happened to Y.T. and that neither she nor Teal ever would have harmed her. Tavarez offered several potential explanations for Y.T.'s injuries: she had run into a door frame days earlier, bumped into the furniture, played roughly with her siblings, and simply fallen down. This first recorded statement was approximately three hours long.

After speaking with another officer, Tavarez admitted that she had banged the back of Y.T.'s head against a table. This statement was not recorded due to some confusion among the law enforcement officers about the operation of the recording equipment. Thus, the officer took another recorded statement from Tavarez, this time with the aid of a lifelike baby doll, which Tavarez used to demonstrate how she banged Y.T.'s head against the table. A time stamp showed that this statement was made on the same day as the initial three-hour statement, but this one did not begin with a statement from the officer that Tavarez was there voluntarily and was free to leave.

Tavarez was charged with felony murder for causing Y.T.'s death, based on the underlying felony of causing injury to a child. The indictment alleged in the alternative that Tavarez caused injury to Y.T. by striking her with her hand or a blunt object.

The investigation centered on interviews with Tavarez and Teal as well as medical and forensic evidence. Teal testified at trial, and Tavarez's recorded statements were admitted without objection. Tavarez said that she "must have done it" and it was "all her fault" because she was the only one there. She also specifically admitted striking Y.T.'s head against a table.

Dr. Rebecca Girardet, a child-abuse pediatrician and Director of the Child Protection Team at Children's Memorial Hermann Hospital, treated Y.T. when she arrived at the hospital. Dr. Girardet testified that Y.T. was "unresponsive," "her brain was dying," and "[s]he was completely dependent on the respirator and IV fluids to keep her alive." Y.T. underwent surgery to relieve pressure caused by the swelling of brain tissue and bleeding under the skull. Dr. Girardet also testified that the injury that caused this fracture could not have been a simple fall, saying: "This was tremendous. It's not consistent with any normal household accident." She testified that Y.T. immediately would have had symptoms such as pain, disorientation, loss of consciousness, and vomiting. She said that Y.T. would not have been able to run and play after such an injury. Dr. Girardet testified that the

5

injury was consistent with the child being struck against a table or something striking her head.

At the time of trial, the medical examiner who had performed the autopsy was no longer employed by Harris County, having accepted a position in a different city. However, Dr. Sara Doyle, the Harris County Assistant Medical Examiner, testified that although she did not perform the autopsy on Y.T., she reviewed it, and she agreed with the findings. She testified that Y.T. died from multiple skull fractures and a subdural hematoma caused by blunt force trauma. Y.T. also had contusions on her back, chest, and lower extremities, a healing mandibular fracture, injuries to her spinal cord, retina, and bilateral optic nerve sheath, and epidural and subdural hemorrhages. Dr. Doyle testified that the fracture to Y.T.'s skull would require "a significant amount of force. . . . it's a very thick part of the skull. So it's not just going to fracture from some trivial bump on the head."

Dr. Doyle testified that the injuries Y.T. suffered could have caused her to be unable to hold her head steady, to have seizures, to appear dazed, to lose consciousness, to be unable to eat or drink, and to be unable to play or run with siblings. She said that Y.T.'s injuries were not consistent with running, playing, or bumping into a door frame—they were consistent with her head being hit against a blunt object once or multiple times.

Dr. Jennifer Love, a forensic anthropologist who formerly had worked for the Harris County Medical Examiner's Office, testified that she became involved with this case during the autopsy, which revealed both new and older, healing fractures of Y.T.'s skull. In particular, there were extensive fractures in the occipital area, the back of the head. There was also a healing fracture in the mandibular area. She explained how the patterns of the fractures and the stage of healing could provide information about when the injury was inflicted and the amount of pressure that likely caused it. Dr. Love explained that the healing process usually begins within 24 to 48 hours after an injury, but the fracture to the back of Y.T.'s head showed no indication of healing, thus she concluded that this fracture occurred "at or around the time of death." She also testified that the "fracture pattern" suggested "an excessive amount of force" "above what is experienced in daily activity." She opined that the trauma to the back of Y.T.'s head was inconsistent with hitting her head on a door frame, running into a wall, or falling from a bed.

At the charge conference, defense counsel requested a general instruction on the voluntariness of the confession, which the court denied. The jury found Tavarez guilty of felony murder, and it assessed punishment at 50 years in prison. Tavarez appealed.

**Analysis**

## I.    Sufficiency of the evidence

In her first issue, Tavarez argues that the evidence is insufficient to support the jury's verdict. She argues that the evidence failed to establish that she caused Y.T.'s death.

When evaluating a legal-sufficiency challenge, we consider all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The standard is the same for both direct and circumstantial evidence cases. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013); *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this is the function of the trier of fact. *See Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *Wiley v. State*, 388 S.W.3d 807, 813 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

A person commits felony murder if during the course or furtherance of commission of a felony, attempt to commit a felony or immediate flight from the commission of a felony, she commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02(b)(3). A person commits the offense of injury to a child if she "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . bodily injury." *Id.* § 22.04(a).

Tavarez argues that the evidence is insufficient to establish that Y.T. died as a result of her action in banging the child's head against a table. Tavarez's argument for the insufficiency of the evidence relies on isolating individual snippets of evidence and considering them without reference to the rest of the record. For example, she argues that she "never mentioned" Y.T. hitting her head on a table until after the officer conducting the interview suggested that scenario. But the recorded interview that was introduced into evidence without objection contradicts that argument. Tavarez also argues that Dr. Doyle's testimony that Y.T. died from blunt trauma that caused skull fractures and subdural hemorrhaging was mere speculation and not sufficiently conclusive to establish beyond a reasonable doubt that Y.T. died as a result of her banging the child's head against a table.

These arguments fail because our standard of review requires us to consider all of the evidence, and the approach Tavarez has taken is inconsistent with this standard of review. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Merritt*, 368 at 525. Tavarez was charged with felony murder based on the underlying felony offense of causing injury to a child. Tavarez admitted that she was alone with Y.T. when her injuries were sustained. "'Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies.'" *Bearnth v. State*, 361 S.W.3d 135, 140 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (quoting *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd)). In addition, Tavarez actually admitted banging Y.T.'s head against a table.

The evidence at trial also showed that the injury that caused Y.T.'s death was sustained at or near the time of her death. Dr. Love testified that the fracture pattern of her skull showed no evidence of healing, which meant that the injury had been sustained at or near the time of death. Dr. Doyle and Dr. Girardet both testified that Y.T. would not have been able to eat, drink, run, or play after sustaining the amount and type of head and brain trauma that she did. However, Teal, Tavarez's mother and stepfather, and Y.T.'s aunt testified that Y.T. behaved normally—playing, eating, and drinking—throughout the weekend before she was

taken to the hospital. This evidence also supports an inference that the injury was sustained when Tavarez was alone with her children.

Before admitting to banging Y.T.'s head against a table, Tavarez offered alternative explanations for Y.T.'s injuries, such as bumping into a door frame or furniture. Dr. Girardet and Dr. Love both testified that Y.T.'s injuries were so severe that they could not have been caused by a household accident. Dr. Girardet and Dr. Doyle opined that the blunt-force-trauma injuries that Y.T. sustained were consistent with her head being banged against a table. All three doctors testified about the immense amount of force required to cause the injuries Y.T. sustained. These were not injuries that could have been caused by another young child.

Dr. Girardet and Dr. Doyle also testified about what immediate effects they would have expected the child to exhibit based on the injuries and trauma they found upon examination. Dr. Girardet testified that Y.T. would have experienced pain, disorientation, loss of consciousness, and vomiting. Dr. Doyle testified that Y.T. would have been unable to hold her head steady, and she would have had seizures, appeared dazed, and lost consciousness. Teal testified that Y.T. appeared dazed and "bobblehead-ish," vomited dark brown material, and had seizures on the way to the hospital. These observations connect the physical and forensic findings to the expert-opinion testimony that Y.T.'s injuries were inflicted by blunt force

trauma at or near the time of death. Dr. Doyle testified that Y.T. died as a result of multiple skull fractures and subdural hematoma due to blunt force trauma.

The jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony and the evidence in this case. *See Adames*, 353 S.W.3d at 860; *Wiley*, 388 S.W.3d at 813. The jury was rationally justified in concluding that Tavarez caused the injury that caused Y.T.'s death in light of the evidence that Tavarez was alone with Y.T. just before her injury was sustained, Y.T.'s injuries were inflicted at or near the time of her death, Y.T. immediately displayed symptoms consistent with blunt force trauma to the back of her head, three doctors testified that an enormous amount of force was required to cause those injuries, expert testimony showed that the child died from skull fractures and subdural hemorrhaging that resulted from blunt force trauma, and she confessed to banging Y.T.'s head against a table. We hold the evidence is sufficient to support the jury's verdict, and we overrule the first issue.

## II.    Jury instruction on voluntariness of Tavarez's statement

In her second issue, Tavarez asserts that the trial court erred by failing to instruct the jury that it could disregard her confession if it found that it was involuntarily made. The only argument that Tavarez makes for the involuntariness of her confession is that she made it at the end of a long day after she had been questioned over the course of approximately nine hours.

12

The trial court must give the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14; *see Reeves v. State*, 420 S.W.3d 812, 818 (Tex. Crim. App. 2013). We employ a two-step process to review allegations of jury-charge error. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). First, we determine whether error exists in the charge. *Id.* If there is error, we then proceed to review the record to determine whether sufficient harm was caused by the error to require reversal of the conviction. *Id.*

A defendant's statement "may be used in evidence" against her if it was "freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. art. 38.21; *see Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). The Code of Criminal Procedure sets forth specific procedures regarding both custodial and non-custodial statements made by a person accused of a criminal offense, providing: "In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." TEX. CODE CRIM. PROC. art. 38.22, § 6. In *Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008), the Court of Criminal Appeals explained that this procedure is triggered when a question about voluntariness is litigated in some manner, for example when an objection or motion to suppress is

raised by the accused or when the court takes up the issue on its own motion.

*Oursbourn*, 259 S.W.3d at 175–76. The Court further explained:

> This is the sequence of events that seems to be contemplated by Section 6: (1) a party notifies the trial judge that there is an issue about the voluntariness of the confession (or the trial judge raises the issue on his own); (2) the trial judge holds a hearing outside the presence of the jury; (3) the trial judge decides whether the confession was voluntary; (4) if the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary; (5) if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction. *It is only after the trial judge is notified of the voluntariness issue (or raises it on his own) that a chain of other requirements comes into play, culminating in the defendant's right to a jury instruction.*

*Id.* at 175 (emphasis supplied).

Tavarez did not file a motion to suppress the recorded statements, object to the admission of the recorded statements, or in any way challenge the voluntariness of the recorded statements until after they had been admitted and played for the jury. Tavarez first raised a question about the voluntariness of the confession at the charge conference. In addition, Tavarez did not offer evidence before the jury suggesting that her confession was not in fact voluntary.

Defense Counsel: I have one more thing. I'm requesting a charge on voluntariness of the confession.

Court: Okay.

Defense Counsel: Not the 38.22, we have to give warnings and all that stuff, but based on the length of the time that she was questioned—I'm not calling it interrogation, but the

14

length of time. It still has to be voluntary, and I think that the state of this record would support the fact that it was involuntary.

State: That it was involuntary?

Defense Counsel: Yes.

Court: My recollection without going back and watching them is that there was—at least from what we have that's recorded, there was questions of you want to talk to us, you want—I don't believe there's any evidence in the record at all that—and you're saying just based on the length?

Defense Counsel: Yeah, I am. I don't know what else I can argue.

Court: Okay. That's denied.

A general voluntariness instruction is required only when the voluntariness of a statement has been litigated in some way such that some evidence that the statement was not voluntary was offered before the jury. *See* TEX. CODE CRIM. PROC. art. 38.22, § 6; *Oursbourn*, 259 S.W.3 at 176. In this case, the voluntariness of Tavarez's confession was not litigated, and no evidence that her statement was involuntary was offered before the jury. We hold that the court did not err by denying the requested jury instruction, and we overrule the second issue.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Higley, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).