**Opinion issued March 31, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00238-CR

————————————

## CHAD COLLINS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1302740**

---

## MEMORANDUM OPINION

A jury convicted Chad Collins of aggravated robbery with a deadly weapon,[1] and the trial court assessed punishment at thirty-two years' confinement. In six points of error, appellant contends that (1) the trial court erred in denying his

---

[1]    *See* TEX. PEN. CODE ANN. § 29.03 (West 2011).

motion to suppress the complainant's out-of-court identification because it was the product of an unlawful search and the identification technique was unconstitutionally suggestive; (2) the trial court erred in admitting the complainant's in-court identification because it was unreliable considering the totality of the circumstances; (3) the trial court violated his right to due process by admitting evidence of the complainant's out-of-court identification without instructing the jury on the unreliability of eyewitness identification; (4) the trial court abused its discretion by admitting evidence of an extraneous offense; and (5) the trial court's assessment of court costs was unlawful. For the reasons stated below, we affirm.

## BACKGROUND

As Jose Castillo and his friend James Mzrazek stood talking in the parking lot of Mzrazek's apartment one night, a car drove through the lot, turned around, and stopped behind Mzrazek. A man got out of the car, approached Mzrazek from behind and, pointing a gun at his back, told him, "[d]on't turn around or I'll shoot you." He then pointed the gun over Mzrazek's shoulder at Castillo and ordered Castillo to empty his pockets. Once Castillo complied and gave him his wallet, the man ordered Castillo and Mzrazek to lie on the ground, and drove off.

Castillo called 911 and when Houston Police Department Officers Carreon and Wyssbrod arrived Castillo provided them a description of the assailant and his

2

car. Officer Carreon then prepared a BOLO ("be on the lookout") alert which was transmitted to other officers on patrol.

That same evening, Officer Duran was conducting random license plate checks in the area when he pulled appellant over on a traffic stop for driving with an expired registration sticker. Appellant provided his driver's license when requested but, since it was his girlfriend's car, he was unable to produce proof of insurance. During the stop, Duran felt that appellant was "squirmy" and "shaky" and this nervous demeanor prompted Duran to ask if appellant had any weapons in the car. When appellant replied "no," Duran asked for consent to search, and appellant consented. Because of appellant's considerable size (variably described as tall as six foot five inches), Officer Duran handcuffed appellant before removing him from the vehicle for safety reasons. Once outside the car, as part of the pat down/frisk for weapons, Duran reached into appellant's pockets and removed a credit card issued to "Jose Castillo" which appellant explained belonged to his "Mexican homie" who had accidentally left it in the car. After Duran placed appellant in his patrol car, he ran a check on the card and determined that it had not been reported as stolen and returned it to appellant. During his search of appellant's car, Officer Duran noticed a hoodie lying in the backseat on top of a pile of clothes and trash. Officer Duran completed his search and released appellant without issuing a citation.

As he began to fill out his paperwork on the traffic stop, he watched appellant pull into the nearby adjacent Sellers Brothers gas station. Listening to the police radio and reading his computer screen, Duran was then alerted to the earlier BOLO on a black suspect and Hispanic complainant and called Officer Carreon, who informed him that the complainant's name was Jose Castillo. Believing that there was no time to call for back-up, Duran approached appellant at the gas station, told him that he thought he had left his flashlight in appellant's car, and obtained his consent to search the car again. Appellant complied and was again handcuffed and placed in the back of Duran's patrol car. Officer Carreon arrived soon thereafter and, believing appellant could be the person who robbed Castillo, contacted Castillo to come to the Seller Brothers and identify the man Castillo later testified was described by Carreon as a "suspect."

Castillo identified appellant as the one who had robbed him but noted that the one who robbed him had worn a black hoodie. Recalling the hoodie in the back of appellant's car, Officer Duran retrieved it. Castillo recognized it because the robber's hoodie had the same design on the back. After Castillo identified appellant, Officer Carreon showed him the credit card retrieved from appellant's pocket, and Castillo confirmed it as his.

Appellant was subsequently charged and indicted with aggravated robbery with a deadly weapon. At a pre-trial hearing, the court denied appellant's motions

4

to suppress the items seized as a result of the two stops, the out-of-court identification, and in-court identification.

The trial court also denied appellant's motion to suppress extraneous offense evidence, ruling that such evidence was admissible to prove appellant's identity. At trial, the State introduced evidence that appellant had robbed Kathryn Scurry and Rachel Dorval at gunpoint as they sat in their car in a parking lot two days earlier at 9:59 p.m., approximately eighteen miles from the location where appellant had robbed Castillo and Mzrazek. The robber had placed a gun to Scurry's head, and demanded their purses, threatened to shoot them and told them to put their heads down and count to thirty. Scurry, who had only an obscured view, noted that the robber was African-American and wore a black hoodie with white stitching on the back. Dorval, who had been in the driver's seat and had a better view, described him as a lighter-skinned black man, with a goatee, and wearing jeans and a black hoodie with stitching on the back. Dorval described the suspect's vehicle as a silver-colored Chevy.

Later that night after the robbery, Scurry sent several text messages, directed to appellant, to Dorval's stolen cell phone, expressing her anger at him for robbing them. Officer Duran, who discovered Dorval's cell phone in his search of appellant's car two days later when Castillo was robbed, noticed the text messages and was able to trace the phone to Dorval. Officer Duran asked Dorval and Scurry

5

to come to the police station to view a photo array that included a photo of appellant. Scurry, who had only seen a silhouette of appellant's face during the robbery, hesitated and eventually identified someone other than appellant. Dorval, who had had a better view of the suspect, identified appellant as the robber from the photo array and later again in court. At trial, Dorval also identified the black hoodie with white stitching on the back that police recovered from appellant's car as the one appellant had worn during the robbery.

After the jury found appellant guilty of aggravated robbery, the trial court assessed his sentence at thirty-two years' confinement. Appellant timely filed this appeal.

**DISCUSSION**

**A. Motion to Suppress**

In his first and second points of error, appellant contends that the trial court erred in denying his motion to suppress the out-of-court identification because (1) it was the product of an unlawful search and (2) the identification technique used was unconstitutionally suggestive. The State argues that the trial court properly denied appellant's motion to suppress because the out-of-court identification was the result of a lawful search and the show-up procedure was not impermissibly suggestive.

## 1. Standard of Review

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court's ruling on a motion to suppress will be affirmed if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

We apply a bifurcated standard when reviewing a trial court's ruling on a motion to suppress evidence. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Under this standard of review, we afford "almost total deference to a trial court's determination of historical facts" and review de novo the court's application of the law of search and seizure. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007).

At the suppression hearing, the trial judge is the sole trier of fact and exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). Absent a showing that the trial court abused its discretion by making a finding unsupported by the record, we defer to the trial court's findings of fact and will not disturb them on appeal. *See State v. Johnston*, 336 S.W.3d 649, 657 (Tex. Crim.

7

App. 2011). When, as here, the trial court makes no findings of fact and conclusions of law, and none are requested, we review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling so long as those findings are supported by the record. *Wiede*, 214 S.W.3d at 25.

## 2. Analysis

Appellant's first point of error challenging the out-of-court identification based on the alleged illegality of the first search is three-fold. First, he argues that Officer Duran's search was conducted without his consent and exceeded what was necessary to determine whether he was armed. Second, he contends that all of the evidence obtained from the search, the second stop, and the show-up should have been suppressed because it was the fruit of the first unlawful search. Third, he argues that the consent he gave for the second search was tainted by the first illegal search of his pockets.

### a. Search

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); *see also United States v. Place*, 462 U.S. 696, 700, 103 S. Ct. 2637, 2641 (1983); *Gutierrez v.*

*State*, 221 S.W.3d 680, 684–85 (Tex. Crim. App. 2007); *Wiley v. State*, 388 S.W.3d 807, 818 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Warrantless searches are per se unreasonable unless the State can prove that the search was conducted pursuant to a recognized exception to the warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)). For example, incident to a lawful arrest, a law enforcement officer may conduct a full but reasonable search of a person. *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973); *see McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003); *Wiley*, 388 S.W.3d at 818.

Another one of those exceptions is a search conducted with the person's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973); *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). The validity and voluntariness of a person's consent to search is a question of fact to be determined by analyzing all of the circumstances of a particular situation. *Schneckloth*, 412 U.S. at 219, 226–27, 93 S. Ct. at 2043–44; *Meekins*, 340 S.W.3d at 458–59. "But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. *Schneckloth*, 412 U.S. at 219, 228, 93 S. Ct. 2041. The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in

9

deciding whether a particular consent search was voluntary or coerced. *Schneckloth*, 412 U.S. at 233, 93 S. Ct. at 2050; *Meekins*, 340 S.W.3d at 549.

Here, appellant does not dispute that he was driving with an expired registration sticker or otherwise argue the legality of the traffic stop.[2] Rather, he contends that the State failed to prove by clear and convincing evidence that his consent was voluntary because Officer Duran took appellant into custody and prevented him from leaving, and he did not advise appellant of his rights before getting his consent to search his car.

At the suppression hearing, Officer Duran testified on direct examination as follows:

> Q:    How was the driver of that vehicle acting from the time you made contact with him?
>
> A:    The driver of the vehicle seemed really squirmy. He was moving around a lot and just kind of nervous. Made me a little nervous as well.
>
> Q:    Based on that, on how he was acting, what did you do?

---

[2]    Driving with an expired registration sticker is a traffic offense. *See* TEX. TRANSP. CODE ANN. § 502.407 (West Supp. 2002). A police officer may arrest someone for any traffic offense he observes, with the exception of speeding or possessing an open container. TEX. CODE CRIM. PROC. ANN. art. 14.01(b) (West 2005) (providing authority to arrest for offenses occurring within officer's view); TEX. TRANSP. CODE ANN. § 543.001 (West 1999) (providing general authority to arrest for traffic offenses); TEX. TRANSP. CODE ANN. § 543.004(a)(1) (West Supp. 2002) (excepting from general authority to arrest speeding and open container violations).

10

A: At that point I asked him if he had any weapons in the vehicle. And he stated, No. I asked for consent to search. He gave me verbal consent.

Q: Okay. You say he gave you verbal consent. He said, Yes, you can search?

A: Yes, sir.

Q: Did he also give you consent to search the vehicle?

A: Yes, sir.

. . .

Q: Okay. So he is detained at that point?

A: Yes, sir.

Q: Do you do that for officer safety?

A: Yes, sir, I do.

Q: You didn't have to fight with him or anything at that time?

A: No, sir, I didn't.

Q: He was cooperative?

A: Yes, sir.

Q: Okay. So you put handcuffs on him. Then you have him step out of the vehicle?

A: Yes, sir.

Q: Where do you place him?

A: I placed him in the backseat of my patrol car to make sure he wouldn't try to run on foot.

11

Q:     Okay.  Was he still nervous at that point?

A:     He was still nervous.  His voice started cracking a little bit.

Q:     Did you pat him down?

A:     I did, sir.

Q:     Did you find any weapons?

A:     I didn't.

Q:     Did you search him at that point or did you search the vehicle?

A:     We always search people first so they can't bring any weapons or contraband into our patrol vehicle.

As an initial matter, we note that appellant did not challenge the voluntariness of his consent in either his written motion to suppress or at the suppression hearing.  Nor did he seek to clarify at the suppression hearing to what appellant consented—the search of the vehicle for weapons or the search of his person.  A party waives error when (1) a suppression motion makes *global arguments* citing little more than constitutional and statutory provisions and (2) fails to argue any specific grounds for suppressing evidence at the suppression hearing.  *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (en banc).  As such, appellant failed to preserve this issue for review.

However, absent waiver, appellant's assertion that his consent was not voluntary because Officer Duran had taken him into custody and prevented him from leaving is also unavailing.  As the testimony above demonstrates, Officer

12

Duran asked for appellant's consent to search *before* he handcuffed him and placed him in the patrol car. Further, appellant's argument that his consent was involuntary because Officer Duran did not advise him of his rights before getting his consent is also without merit. The reading of *Miranda* rights is not required as a precondition for obtaining consent to search. *See Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003) ("Contrary to appellant's claims, we know of no authority that requires informing a suspect of his rights under *Miranda* before obtaining a consent to search, and appellant points to none.").[3]

Appellant also contends that Officer Duran did not seek consent to search his pockets, and that his consent to search his car could not be reasonably construed to extend to a search of his pocket. The record, however, is less than clear as to this argument and can be understood as supporting a contrary conclusion. Officer Duran testified as follows:

A:    At that point I asked him if he had any weapons in the vehicle. And he stated, No. I asked for consent to search. He gave me verbal consent.

Q:    Okay. You say he gave you verbal consent. He said, Yes, you can search?

A:    Yes, sir.

---

[3]    *Miranda* warnings and state statutory warnings are required only when there is a custodial interrogation. *Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)); U.S. CONST. amend. 5; TEX. CODE CRIM. PROC. ANN. art. 38.22.

13

Q:  Did he *also* give you consent to search the vehicle?

A:  Yes, sir.

(emphasis added)

That there is uncontroverted evidence that appellant consented to *a* search is clear, but the record is less distinct as to whether appellant consented to a search of the vehicle or his person.

Q:  Based on . . . how he was acting, what did you do?

A:  At that point I asked him if he had any weapons *in the vehicle* (emphasis added).  And he stated, No.  I asked for consent to search.  He gave me verbal consent.

Q:  Okay.  You say he gave you verbal consent.  He said, Yes, you can search?

A:  Yes, sir.

. . .

Q:  Did you pat him down?

A:  I did, sir.

Q:  Did you find any weapons?

A:  I didn't.

Q:  Did you search him at that point or did you search the vehicle?

A:  We always search people first so they can't bring any weapons or contraband into our patrol vehicle.

14

Officer Duran's initial inquiry was focused on weapons in appellant's vehicle—prior to placing him into his patrol car, Officer Duran patted appellant down for weapons. And the officer's response to the State's question at the suppression hearing was limited to weapons.

An officer may legally intrude upon any detained citizen to frisk them or conduct a pat down of their person to determine if they possess weapons. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968). Thus, the officer here needed no consent to search for weapons. *Terry* stop-and-frisks are judicially limited in their scope, however, and do not include an officer reaching into a suspect's pockets unless there is an indication that the suspect may have a weapon or the contour and mass of the pocket's contents make it apparent that they contain contraband. *See id.* (noting that search for weapons, in absence of probable cause to arrest, must be strictly circumscribed by exigencies which justify its initiation). Nonetheless, as we previously noted, absent an objection or clarification on cross-examination by trial counsel at the suppression hearing to clarify to what appellant consented, there is nothing preserved for our review.

We review the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling so long as those findings are supported by the record. *Wiede*, 214 S.W.3d at 25. Based on the record before us, we cannot say that the trial court abused its

discretion in determining that appellant consented to a search, and appellant failed to preserve error regarding the scope of his consent.

Appellant also contends that but for the credit card information obtained from the search of his pocket and car during the first stop, Officer Duran would not have had any probable cause or reasonable suspicion to stop appellant a second time. Without that second stop, appellant reasons, police would not have conducted the show-up that led to Castillo's out-of-court identification of him and the seizure of his hoodie from the car. Appellant also argues that consent for the second search of the vehicle at the gas station was tainted by the first illegal search of appellant's pockets. Appellant's arguments, however, presuppose a finding that the officer's first search was illegal. Because we have concluded that the trial court did not err in determining that appellant consented to a search, and appellant did not preserve error regarding the scope of that consent, appellant's arguments based on the alleged illegality of the first search likewise fail. We overrule appellant's first point of error.

### b. Out-Of-Court Identification

In his second point of error, appellant contends that the trial court erred in denying his motion to suppress the out-of-court identification because the identification technique was unconstitutionally suggestive and gave rise to a substantial likelihood of misidentification. The State argues that the show-up was

not impermissibly suggestive and there was no substantial likelihood of misidentification.

Courts apply a two-pronged analysis for determining if an out-of-court identification is unconstitutionally suggestive. *See Jackson v. State*, 657 S.W.2d 123, 127 (Tex. Crim. App. 1983) (en banc). The first prong requires a reviewing court to determine whether a "very substantial likelihood of misidentification existed." *Id.* If the court concludes that the pretrial procedure was not impermissibly suggestive, then the analysis ends. *See Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995) (en banc). If, however, the court finds that the pretrial procedure was impermissibly suggestive, then the defendant must show by clear and convincing evidence that the impermissibly suggestive pretrial procedure tainted the in-court identification. *See Jackson*, 657 S.W.2d at 127. Reliability is the "linchpin" in determining admissibility of such identification testimony. *Barley*, 906 S.W.2d at 34. Furthermore, the analysis requires an examination of the totality of the circumstances surrounding the identification. *Id.* at 33.

In determining whether there is a substantial likelihood of misidentification based on an impermissibly suggestive pretrial identification procedure, we consider the following list of non-exclusive factors: (1) the witness's opportunity to view the criminal; (2) the witness's degree of attention; (3) the accuracy of the witness's description of the suspect; (4) the level of certainty at the time of

confrontation; and (5) the time between the crime and confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 382 (1972). We review these factors in the light most favorable to the trial court's ruling, *Ibarra v. State*, 11 S.W.3d 189, 195–96 (Tex. Crim. App. 1999), and weigh them against the corrupting effect of the suggestive identification procedure itself. *See Burkett v. State*, 127 S.W.3d 83, 87 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

Here, Castillo testified that he was able to view the robber for thirty to forty-five seconds in a well-lit parking lot.[4] Castillo's level of attention was high, as he was not merely a passerby or a bystander, but instead was the victim of the crime and was held at gunpoint. Castillo described the robber to Officer Carreon as a tall black male, approximately six feet tall, with a slender to medium build, and wearing a dark hoodie with a white design on the back and long shorts. Castillo also described the car and remembered the first three digits of the license plate. Officer Carreon testified that many people do not recall as many details as Castillo did. At the show up, appellant was no longer wearing the shirt and shorts that Castillo had described to Officer Carreon. However, the hoodie that Castillo had described matched the hoodie police took out of appellant's car and later showed to

---

[4]    Although there is some evidence in the record to the contrary, the trial court could have believed Castillo's testimony that the parking lot was well lit. *See Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) (noting reviewing court examines evidence in light most favorable to trial court's ruling on motion to suppress evidence).

18

Castillo after he had identified appellant. Castillo testified that he was initially about 90% positive of his identification of appellant at the show up and then became 100% positive when appellant grinned at him, revealing gold teeth. Officers Carreon and Duran testified that Castillo positively identified appellant at the show up as the robber and that he was confident in his identification. Finally, the time between the robbery and the identification at the show up was between an hour and an hour and a half.

Based on an analysis of the *Biggers* factors, we conclude that Castillo's out-of-court identification was reliable and not impermissibly suggestive.[5] Appellant's second point of error is overruled.

### c. In-Court Identification

In his third point of error, appellant contends that the trial court erred in admitting Castillo's in-court identification of appellant because, considering the totality of the circumstances, it was unreliable. The State argues that the record establishes that the in-court identification was reliable.

Determining the admissibility of an in-court identification involves a two-step analysis: (1) whether the out-of-court identification procedure was impermissibly suggestive, and (2) whether that suggestive procedure gave rise to a

---

[5] Because we conclude that the pretrial procedure was not impermissibly suggestive, we need not consider whether the procedure created a substantial likelihood of misidentification. *See Barley*, 906 S.W.2d at 34.

19

very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967 (1968); *Barley*, 906 S.W.2d at 33. Each case must be considered on its own facts. *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971. As with the out–of-court identification, the analysis requires an examination of the totality of the circumstances surrounding the identification, *id.*, the defendant must prove the two elements by clear and convincing evidence, *Barley*, 906 S.W.2d at 33–34, and reliability is the crux of the matter. *Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998) (en banc). The *Biggers* factors are evaluated in assessing the reliability of the in-court identification. *Biggers*, 409 U.S. at 199, 93 S. Ct. at 382.

As to the first step of the analysis, we previously concluded that the out-of-court identification procedure was not impermissibly suggestive. As such, we need not evaluate whether the procedure created a very substantial likelihood of irreparable misidentification. *See Barley*, 906 S.W.2d at 34. However, even if we were to reach the second step, we conclude that the totality of the circumstances does not reveal a substantial likelihood of irreparable misidentification. As previously discussed, Castillo's out-of-court identification was reliable based upon our evaluation of the *Biggers* factors. Appellant also relies upon (1) the return of the credit card to Castillo, (2) appellant's appearance at the suppression hearing in jail clothes, and (3) the video lineup the prosecutor showed Castillo to refresh his

20

memory. The record reflects that police returned Castillo's credit card to him after he had positively identified appellant at the show up. Castillo testified that he was positive at the show up that appellant was the robber based on appellant's car, his gold teeth, his height, and his hoodie, and before the credit card was returned to him. At trial, Castillo also testified that the fact that appellant was wearing jail clothes at the suppression hearing did not influence his in-court identification. According to Castillo, the video line-up helped refresh his memory and "settle[d] it pretty much," but he was able to identify appellant even before that.

Weighing the *Biggers* factors against the corrupting effect of the hypothetically suggestive pretrial identification, we conclude that no substantial risk of irreparable misidentification was created and that the in-court identification was admissible. We overrule appellant's third point of error.

## B. Jury Instruction

In his fourth point of error, appellant contends that the trial court violated his due process rights by admitting evidence of Castillo's out-of-court identification without instructing the jury on the unreliability of eyewitness identification. The State argues such an instruction is not law applicable to the case and would be an improper comment on the weight of the evidence.

A trial court must submit to the jury "the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2012); *Bolden v. State*, 73 S.W.3d 428,

21

431 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). When a statute requires an instruction under the circumstances, that instruction is "law applicable to the case," and the trial court must instruct the jury regarding what is required under the statute. *Oursbourn v. State*, 259 S.W.3d 159, 180–81 (Tex. Crim. App. 2008).

Texas Code of Criminal Procedure article 38.23(a) provides as follows:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2012). The Texas Court of Criminal Appeals has held that article 38.23, by its terms, applies only to illegally obtained evidence, not to in-court identifications. *Allen v. State*, 511 S.W.2d 53, 54 (Tex. Crim. App. 1974); *see Andujo v. State*, 755 S.W.2d 138, 143 (Tex. Crim. App. 1988) (en banc).

Moreover, a challenge to the accuracy of witness identification raises the defensive issue of mistaken identification. *See Wilson v. State*, 581 S.W.2d 661, 663 (Tex. Crim. App. 1979) (noting that mistaken identification is traditional defensive issue because State has burden to prove identity of defendant as party

22

who committed crime charged). A trial court must submit the issue if the evidence warrants it and the defendant timely requests it. *See id.* The trial court, however, has no statutory duty to sua sponte instruct the jury on an unrequested defensive issue because a defensive issue is not "applicable to the case" unless the defendant timely requests the issue or objects to the issue's omission from the jury charge. *Oursborn*, 259 S.W.3d at 180. Here, appellant made no such request or objection. Therefore, we conclude that the trial court did not err by failing to sua sponte instruct the jury on the issue of appellant's in-court identification. Appellant's fourth point of error is overruled.

## C. Extraneous Offense Evidence

In his fifth point of error, appellant contends that the trial court abused its discretion by admitting evidence of an extraneous robbery during the guilt-innocence phase of trial. The State argues that the trial court properly admitted the extraneous offense evidence to prove appellant's identity.

### 1. Standard of Review

A trial court's decision to admit or exclude evidence of extraneous conduct is reviewed for abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* at 343–44. A trial court's ruling is generally within this

23

zone if (1) the extraneous evidence is "relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Id.* at 344.

## 2. Rule of Evidence 404(b)

Under Texas Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). However, it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" *Id.* A party may introduce evidence of an extraneous offense if such evidence "logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact." *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005).

In his brief, appellant acknowledges that his identity was at issue in this case. Thus, an elemental fact (i.e., identity) was placed at issue at trial. *See Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006) (noting that extraneous offense evidence may be admissible under Rule 404(b) to show identity only when identity is at issue). However, appellant argues that the extraneous offense was not

committed with any type of "signature" that would make it admissible to prove the State's contention that he was the robber in this case.

When an extraneous offense is introduced to prove identity, "it must be so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'" *Id.* (quoting *Martin*, 173 S.W.3d at 468). Extraneous offense evidence is admissible to prove identity "when the common characteristics of each offense are so unusual as to act as the defendant's 'signature.'" *Page*, 213 S.W.3d at 336 (quoting *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996)); *see also Russell v. State*, 113 S.W.3d 530, 541 (Tex. App.—Forth Worth 2003, pet. ref'd) ("[T]o be admissible to show identity, an extraneous offense must be so similar to the charged offense as to *mark* the offenses as the defendant's handiwork.") (emphasis in original) (quotation omitted). The "signature" must be apparent from a comparison of the circumstances in both cases. *Page*, 213 S.W.3d at 336. "Without a high degree of similarity, the probative value of the extraneous offense evidence is outweighed by its prejudicial effect." *Jabari v. State*, 273 S.W.3d 745, 752 (Tex. App.—Houston [1st Dist.] 2008, no pet.). However, Texas law does not require extraneous offense evidence to be completely identical to the charged offense in order to be admissible to prove identity. *See Page*, 213 S.W.3d at 338. In reviewing the trial court's determination, we consider the specific characteristics of the offenses and the time

25

interval between them. *See Jabari*, 273 S.W.3d at 752. "Sufficient similarity may be shown by proximity in time and place *or* by a common mode of committing the offenses." *Id*.

At trial, the State was allowed to introduce evidence that appellant had robbed Kathryn Scurry and Rachel Dorval two days before the robbery in this case. The record reveals that the charged offense and the extraneous offense had the following similarities: (1) Castillo, Dorval, and Scurry described the suspect as a black male wearing a black hoodie with stitching on the back (and both later identified the hoodie found in appellant's car as the one he wore during the robbery); (2) the suspect robbed two people in each incident; (3) the suspect committed the robbery in a parking lot; (4) the robbery took place at approximately the same time of night; (5) the robber held a gun on one of the victims in a manner that prevented the victim from seeing him and while threatening the other victim; (6) the robber threatened to shoot the victims in each incident; (7) the robber told Dorval and Scurry to put their heads down and told Mzrazek and Castillo to get on the ground before he drove off; and (8) Castillo and Dorval described the suspect's vehicle as a beige or silver-colored Chevrolet.

Although the details of the offenses differed in some respects, Texas law does not require extraneous offense evidence to be completely identical to the charged offense in order to be admissible to prove identity. *See Page*, 213 S.W.3d

26

at 338. Here, the similarities in the proximity of time and setting, the mode of commission of the two offenses, and the victims' similar descriptions of the robber and his hoodie constitute sufficiently distinguishing characteristics such that the State's introduction of the extraneous offense to prove appellant's identity is permissible. *See id.* at 337–38 (relying on eight similarities in concluding that offenses were sufficiently similar to establish signature).

Appellant also contends that the State failed to prove the extraneous offense beyond a reasonable doubt because Scurry was unable to positively identify him as the robber, and that her inability to do so refutes Dorval's positive identification of him. Appellant's argument is unavailing. The testimony of one eyewitness is sufficient to identify a defendant. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (holding conviction may be had on testimony of single eyewitness). As the sole judge of the credibility of the witnesses, it was up to the jury to decide whether to believe Dorval's testimony despite any discrepancies. *See Kromah v. State*, 283 S.W.3d 47, 51–52 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (declining to reweigh jury's decision to believe eyewitness despite discrepancies) (citing *Johnson v. State*, 176 S.W.3d 74, 78 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (noting jury's decision not manifestly unjust merely for resolving conflict in State's favor)).

### 3. Rule 403

Even when the admission of extraneous offense evidence is permissible under Rule 404(b), we must still determine whether the probative value of the offense is substantially outweighed by the danger of unfair prejudice under Rule 403 by considering: (1) the strength of the extraneous evidence to make a fact of consequence more or less probable; (2) the potential of the extraneous offense to impress the jury in some irrational but indelible way; (3) the time during trial that the State needed to develop evidence of the extraneous offense; and (4) the State's need for the extraneous offense evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). We uphold the trial court's ruling on a Rule 403 balancing test, whether explicit or implied, if it is within the zone of reasonable disagreement. *Jabari*, 273 S.W.3d at 753. Although appellant does not address any of these considerations but summarily concludes that the prejudicial effect of the extraneous offense evidence substantially outweighed its probative value, we will address them below.

#### a. Probative Value

"Probative value" refers to "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation." *Gigliobianco*, 210 S.W.3d at 641. Here, it is undisputed that the extraneous offense evidence is probative of an

element of the charged offense, i.e. identity. Further, the extraneous evidence illustrated the similarities between the robberies. Because this evidence makes appellant's identity as the robber more probable, this factor weighs in favor of admissibility. *See Blackwell v. State*, 193 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

### b. Potential to Impress Jury

We then examine the extraneous evidence "for its potential to impress the jury in some irrational but indelible way." *Id.* To avoid any impermissible inference of character conformity, a limiting instruction is given, as was done here when, prior to the presentment of the extraneous evidence, the trial court orally admonished the jury that the evidence could be considered solely for the purpose of assisting in determining the identity of the perpetrator. The jury charge, too, further expressly instructed the jury to consider the extraneous offense evidence only in determining the issues of identity. *See id.* (approving jury instruction limiting jury's reliance on extraneous offense evidence to issues enumerated in 404(b)). Because the jury was provided with these express written and oral instructions limiting its consideration of the extraneous offense evidence, we conclude that this factor weighs in favor of admissibility.

### c. Time Spent Developing Evidence

With regard to the third factor, we consider the time that the State needed to develop evidence of the extraneous offense. Here, roughly 204, or nearly one-half, of the approximately 412 pages of testimony during the guilt-innocence phase of the trial involved the presentation of the extraneous offense evidence. Thus, this factor weighs against admissibility.

### d. State's Need for the Evidence

Finally, the State's need for the extraneous offense evidence in this case was considerable. Given that appellant denied that he was the one who robbed Castillo, the issue of appellant's identity was central to the State's case. Castillo was the only witness to the robbery. Mzrazek, the other victim, never got a clear view of the robber's face and was unable to identify a suspect. In light of these facts, the State's need for the extraneous offense evidence was high.

A trial court's ruling on admitting extraneous offense evidence must be upheld so long as it is "within the zone of reasonable disagreement." *See De La Paz*, 279 S.W.3d at 343. In balancing the above factors in this case, we conclude the trial court did not abuse its discretion under Rule 403 in admitting the extraneous-offense evidence. *See Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) ("[Rule 403] envisions exclusion of evidence only when there is

a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'"). We overrule appellant's fifth point of error.[6]

**D. Court Costs**

In his sixth point of error, appellant contends that the trial court's assessment of court costs was unlawful. The State argues that appellant failed to raise this issue in the trial court below and, thus, waived this issue on appeal. It further argues that, even absent waiver, the record supports the costs assessed by the court.

A convicted person has a statutory obligation to pay court costs. *See* TEX. CODE CRIM. PROC. ANN. art. 42.16 (West 2006) (requiring judgments imposing punishments other than fines to include costs). The trial court is statutorily required to assess costs upon conviction. TEX. CODE CRIM. PROC. ANN. art. 102.021 (West Supp. 2011) (mandating that convicted defendant "shall pay" associated court costs). Article 103.001 of the Code of Criminal Procedure states that "[a] cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of costs, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost." TEX. CODE CRIM. PROC. ANN. art. 103.001 (West 2006).

---

[6] Under his fifth point of error, appellant also asserts that the extraneous offense was not proven beyond a reasonable doubt. Because he did not present this argument to the trial court below, he has not preserved this issue for our review. *See* TEX. R. APP. P. 33.1(a).

Here, the judgment includes an assessment of $339.00 in court costs. Appellant contends that the record does not include a bill of costs or other documentation supporting the assessment of costs. The record, however, contains a supplemental clerk's record which includes a certified bill of costs supporting the $339.00 assessment of court costs alleged in the judgment. Because the record clearly supports the costs assessed by the trial court, we overrule appellant's sixth point of error.

## Conclusion

We affirm the judgment of the trial court.


Jim Sharp
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).