**Opinion filed August 7, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00151-CR

_____

## RONALD WAYNE SANDERS, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 24915A**

## M E M O R A N D U M   O P I N I O N

Ronald Wayne Sanders appeals his jury convictions for possession of methamphetamine with intent to deliver and possession of certain chemicals with the intent to manufacture methamphetamine. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.112(a), 481.124(a)(3) (West 2010). For each conviction, the trial court assessed Appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of twenty-five years, with the sentences to begin only after the completion of Appellant's sentence for his

prior conviction in cause no. 6824 in the 42nd District Court of Callahan County. In three issues on appeal, Appellant argues that the evidence was insufficient to sustain his convictions and that his punishment is excessive and disproportionate and therefor violates the Eighth Amendment. *See* U.S. CONST. amend. VIII. We affirm.

*Background Facts*

The indictment alleged that, on or about August 27, 2010, Appellant knowingly possessed more than four hundred grams of methamphetamine with the intent to deliver. The indictment further alleged that, on or about August 27, 2010, Appellant possessed pseudoephedrine with the intent to unlawfully manufacture methamphetamine.

Narcotics Agent Chad Jenkins of the Abilene Police Department testified that he obtained a warrant to search the house located at 1800 Jefferies in Abilene, Texas, after he received information that methamphetamine was being made and sold there by Tammy Sanders, Appellant's mother.[1] Agent Jenkins and several other officers executed the warrant on August 27, 2010.

Using a battering ram, Agent Jenkins and the other officers entered the house through the side door. Once inside the house, Agent Jenkins smelled burning marihuana and found Rebecca Bardwell standing near the kitchen table. Agent Jenkins also observed Sanders running into the bathroom in order to flush something down the toilet. As another officer followed Sanders into the bathroom, Appellant attempted to block the officer's path. The officer then forced Appellant to the ground and ran into the bathroom.

---

[1]We will refer to Appellant's mother as "Sanders" throughout this opinion.

After Appellant, Sanders, and Bardwell were seated in the living room, Agent Jenkins questioned them and read them their *Miranda*[2] rights. Agent Jenkins presented Sanders with the warrant to search the house. Sanders stated that "anything in the house was hers."

Agent Jenkins stated that he believed Appellant, Sanders, and Bardwell all lived at the house at 1800 Jefferies at the time the search warrant was executed. Agent Jenkins noted that all three individuals looked like they had just awakened. Appellant was not wearing a shirt, socks, or shoes, and Sanders had on pajama pants.

Agent Jenkins explained that the house had two bedrooms. Agent Jenkins determined that the northwest bedroom belonged to Sanders, and on the bed in that room, he found the following items in plain view: a set of keys with a small metal container attached that contained four small Ziploc bags of methamphetamine,[3] $1,710 in cash, nine blister packs of pseudoephedrine pills of different strengths, and several cell phones that contained messages consistent with drug dealing. Agent Jenkins explained that pseudoephedrine is used to make methamphetamine and that drug dealers often carry multiple cell phones to avoid being identified by the police.

Officers also found Sanders's purse in her bedroom. Inside the purse, Agent Jenkins found a phone list and a ledger containing names and amounts of money. Agent Jenkins stated that drug dealers often maintain a ledger to keep track of the amount of drugs they have distributed and the money that is owed to them.

On the floor of Sanders's bedroom, Agent Jenkins found several crack pipes with traces of cocaine and a loaded syringe that later tested positive for

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]Forensic Scientist William L. Todsen testified that this substance weighed 0.43 grams and contained methamphetamine.

3

methamphetamine. In the closet of Sanders's bedroom, Agent Jenkins found what he referred to as a "lab bag," a bag containing several items commonly used to make methamphetamine. The bag contained coffee filters, plastic tubing, and electrical tape. Agent Jenkins noted that coffee filters can be used to filter off the fillers in pseudoephedrine pills and tubing can be used to manufacture anhydrous ammonia, an ingredient in methamphetamine.

In the kitchen, Agent Jenkins found used coffee filters in a basket on a shelf, thirteen rounds of nine-millimeter ammunition on the table, and a picture of Bardwell on the refrigerator. In the refrigerator, Agent Jenkins found a prescription bottle with Appellant's name on it. Underneath the kitchen sink, Agent Jenkins found three glass mason jars with a heavy-colored residue that tested positive for methamphetamine. Agent Jenkins explained that glassware is commonly used to make methamphetamine because the chemicals involved in the process are very volatile.

After searching the southwest bedroom of the house, Agent Jenkins determined that Appellant was staying in that room. Agent Jenkins stated that he based this determination on several items he found in the room, including mail addressed to Appellant at the previous address he shared with his mother. Additionally, Appellant stated that he worked for a drilling company, and a hard hat was found in the bedroom closet. Men's clothing and shoes were also found in the closet.

Agent Jenkins additionally found a musical instrument case that contained a loaded nine-millimeter handgun, lithium batteries, and a pawn shop receipt in Appellant's name in the southwest bedroom. Agent Jenkins explained that methamphetamine can be made by removing the lithium from lithium batteries and adding it to anhydrous ammonia and pseudoephedrine. Agent Jenkins also noted

4

that the pawn receipt was for two guitars Appellant purchased on layaway and that two guitars were found in the southwest bedroom.

Additionally, in the southwest bedroom, Agent Jenkins found a small bag of marihuana; several driver's licenses[4] that did not belong to Appellant, his mother, or Bardwell; and a set of digital scales with a residue that later tested positive for methamphetamine. Agent Jenkins explained that scales are often used by drug dealers to weigh and price their product.

In the closet of the southwest bedroom, Agent Jenkins found several Ziploc bags, some of which had an eight-ball printed on them and some of which had a Playboy bunny printed on them; a cooler of used coffee filters; two used syringes; a metal spoon; and a measuring cylinder. The spoon and cylinder had a residue on them that later tested positive for methamphetamine.[5] Agent Jenkins explained that a metal spoon can be used to heat methamphetamine for injection.

Agent Jenkins also searched a shed behind the house, and he determined that it was an active methamphetamine lab. Inside the shed, Agent Jenkins found a camp stove and a "lab bag" containing bottles of muriatic acid, tubing, plastic bottles, starting fluid, glassware, a garden sprayer, a pitcher, and fuel for the stove. In the pitcher were used coffee filters containing over 400 grams of pink granular material that was later confirmed to contain methamphetamine.[6]

Based on the search of the house and Appellant's behavior upon the officers' arrival, Agent Jenkins determined that Appellant was an active participant in the manufacture of methamphetamine at the house. Agent Jenkins also determined

---

[4]Agent Jenkins later determined that one of these licenses had been stolen in an aggravated robbery and another had been stolen in a burglary. Agent Jenkins testified that he had not confirmed Appellant's involvement in either the aggravated robbery or the burglary.

[5]Todsen explained that the total amount of powder he recovered from the spoon and the cylinder weighed 0.02 grams and contained methamphetamine.

[6]Forensic Scientist Todsen confirmed that the substance weighed 401.11 grams and contained methamphetamine.

that Appellant used and sold methamphetamine. Agent Jenkins based this determination on the following information:

> The amount of evidence that's there in plain view, the fact that he's there almost completely undressed when we arrived, the odor of marijuana in the residence and then I find marijuana in the bedroom which had the male clothing, a hard hat, mail addressed to him. This is his mother's residence. I find medication in the refrigerator with his name on it. There's several things tying him to that residence…. [A]lso that, you know, he's obviously obstructing us from executing that search warrant and preventing us from stopping Tammy Sanders from flushing whatever she did down the toilet.

Rebecca Bardwell testified that she was dating Appellant at the time the police raided the house at 1800 Jefferies and noted that Appellant lived at the house with his mother. Bardwell identified the southwest bedroom of the house as Appellant's bedroom, and she stated that she slept there a few nights. Bardwell noted that she slept at the house the night before the raid and that she was smoking marihuana in the kitchen when the police arrived. Bardwell recalled that Appellant attempted to block officers from gaining access to his mother after she ran into the bathroom.

Bardwell stated that she and Appellant used methamphetamine together and that Appellant provided it. Bardwell explained that Appellant and his mother made methamphetamine and that people purchased it at the house constantly. Bardwell noted that she had never been in the shed behind the house but that she had seen Appellant and his mother in the backyard a couple of times. Bardwell explained that she was convicted of possession of methamphetamine based on the facts of this case and that she received fifteen months of incarceration as punishment for the offense.

Sanders testified that she was smoking dope with Bardwell when police officers arrived at her house on August 27, 2010. Sanders stated that she ran to the

6

bathroom and flushed the dope down the toilet immediately after the officers entered the house. She confirmed that she told the officers that everything in the house belonged to her, and she reiterated that statement at trial. Sanders claimed that Appellant did not live at the house at 1800 Jefferies and that he did not stay there the night before the raid. She stated that Appellant was only at the house at the time of the raid because he had come over to return her car. Sanders acknowledged that a number of Appellant's personal belongings were at her house but stated that this was simply due to the fact that Appellant had left some of his stuff there.

Sanders admitted that she made and sold methamphetamine but claimed that Appellant was not involved in the business. Sanders also claimed that Appellant did not use drugs and that he did not approve of her involvement with drugs. Sanders stated that Appellant never dated Bardwell and that he did not give her methamphetamine. Sanders also claimed that Bardwell was not staying at the house at the time of the raid.

*Analysis*

In his first and second issues, Appellant challenges the sufficiency of the evidence to support his convictions. We review a sufficiency of the evidence issue, regardless of whether it is denominated as a legal or factual claim, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). In conducting a sufficiency review, we defer to the jury's role as the sole judge of the witnesses' credibility and the weight

7

their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

In his first issue, Appellant asserts that his conviction for possession of methamphetamine with intent to deliver cannot be upheld because the State failed to link him to the place where the manufacturing was taking place or to the actual act of manufacturing. In his second issue, Appellant argues similarly that the State failed to link him to the pseudoephedrine or to the place where it was found. To prove unlawful possession of a controlled substance, the State must show (1) that the accused exercised control, management, or care over the substance and (2) that the accused knew the matter possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). When the accused is not in exclusive possession of the place where the contraband is found, the State must show additional affirmative links between the accused and the contraband. *See Olivarez v. State*, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.). An affirmative link generates a reasonable inference that the accused knew of the contraband's existence and exercised control over it. *See id.* The "affirmative links rule" is designed to protect the innocent bystander from conviction based solely on fortuitous proximity to someone else's drugs. *Poindexter*, 153 S.W.3d at 406. Thus, when the accused is not in exclusive possession of the place where the substance is found, there must be additional independent facts and circumstances that affirmatively link the accused to the contraband. *Id.*

Courts have identified the following factors as affirmative links that may establish an accused's knowing possession of a controlled substance:

> (1) the [accused's] presence when a search is conducted; (2) whether the contraband was in plain view; (3) the [accused's] proximity to and the accessibility of the [contraband]; (4) whether the [accused] was under the influence of narcotics when arrested; (5) whether the [accused] possessed other contraband or narcotics when arrested; (6) whether the [accused] made incriminating statements when arrested; (7) whether the [accused] attempted to flee; (8) whether the [accused] made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the [accused] owned or had the right to possess the place where the [contraband] was found; (12) whether the place where the [contraband] was found was enclosed; (13) whether the [accused] was found with a large amount of cash; and (14) whether the conduct of the [accused] indicated a consciousness of guilt.

*Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006). It is the logical force of such links, rather than mere quantity, that is important in determining whether the evidence is sufficient to connect the accused to the alleged contraband. *Id.* at 162. The list of affirmative links is not exclusive. *Id.* Appellate courts do not balance the absent affirmative links against the affirmative links that are present. *See Wiley v. State*, 388 S.W.3d 807, 814 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). In other words, the absence of various affirmative links is not evidence of innocence. *Id.*

We first note that the methamphetamine possession charge does not contain an allegation of manufacture. However, the process of manufacture is related to the possession charge because the bulk of the methamphetamine was found with the methamphetamine lab in the shed. Additionally, the possession-of-pseudoephedrine charge included an allegation that Appellant possessed pseudoephedrine with the intent to manufacture methamphetamine.

9

Although Appellant's mother claimed that he did not live at the house, the State presented a large amount of evidence that suggested otherwise. Appellant's girlfriend at the time testified that he lived at the residence, and the officers found mail and medicine in Appellant's name in the house, as well as men's clothing and a hard hat. Additionally, Appellant was only partially dressed when officers entered the home, and he appeared to have just awakened, indicating that he lived at the residence. While Appellant's mother testified that he did not live there, the jury was free to reject this testimony, and we defer to the jury's credibility determination in this regard.

Appellant correctly asserts that evidence of his presence at a drug lab, without more, is insufficient to support either conviction. *See Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). "The purpose of this requirement is to protect the innocent bystander who merely inadvertently happens onto a methamphetamine lab." *Id.* "Although mere presence at a drug laboratory is insufficient to support a conviction for manufacturing, it is a circumstance tending to prove guilt that, when combined with other facts, shows that the accused was a participant in the manufacturing." *Webb v. State*, 275 S.W.3d 22, 27 (Tex. App.—San Antonio 2008, no pet.).

We conclude that the evidence established that Appellant did not inadvertently come into contact with a methamphetamine lab. Items related to the manufacture of methamphetamine were located within Appellant's residence in plain view, including the pseudoephedrine. Inside what appeared to be Appellant's bedroom, officers found Ziploc bags with identifying marks, two used syringes, marihuana, a handgun, a metal spoon, a measuring cylinder, and a set of digital scales. The spoon, cylinder, and scales all tested positive for methamphetamine. Additional contraband and materials often used in making methamphetamine were found throughout the house and in the shed located in the backyard, and a large

10

amount of cash was found inside the house. The prevalence of manufacturing items located within Appellant's residence served to link him to the active methamphetamine lab located in the shed behind the residence. Furthermore, Appellant attempted to aid his mother's attempt to destroy evidence when officers arrived at the house, indicating a consciousness of guilt on his part. Bardwell testified that Appellant sold methamphetamine. Bardwell also testified that she witnessed people buying methamphetamine at the house "nonstop."

Viewing all of the evidence in the light most favorable to the verdict, we conclude that any rational trier of fact could have found that Appellant possessed over 400 grams of methamphetamine with the intent to deliver and that he possessed the pseudoephedrine with the intent to manufacture. Accordingly, we overrule Appellant's first and second issues.

In his third issue, Appellant argues that his sentence is excessive and disproportionate to the offenses and, therefore, constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. *See* U.S. CONST. amend. VIII. Appellant bases this argument on the fact that the trial court stacked his sentences arising from the instant underlying convictions on top of the sentence arising from his Callahan County conviction. Appellant additionally complains that his sentence is excessive as compared to the sentence received by Bardwell even though their involvement and criminal histories are relatively similar.

In reviewing a trial court's sentencing determination, "a great deal of discretion is allowed the sentencing judge." *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). We will not disturb a trial court's decision as to punishment absent a showing of abuse of discretion and harm. *Id.* As a general rule, punishment is not cruel and unusual if it falls within the range of punishment

11

established by the legislature. *Id.*; *Dale v. State*, 170 S.W.3d 797, 799 (Tex. App.—Fort Worth 2005, no pet.).

Ordinarily, a conviction for possession of methamphetamine in excess of 400 grams with an intent to deliver is punishable by imprisonment in the Texas Department of Criminal Justice for life or for a term of not more than ninety-nine years or less than fifteen years, and a fine not to exceed $250,000. TEX. HEALTH & SAFETY CODE ANN. § 481.112(f) (West 2010). Additionally, a conviction for possession of pseudoephedrine with the intent to manufacture methamphetamine is ordinarily punishable as a second-degree felony. *Id.* § 481.124(d)(1). Because Appellant was charged and convicted as a habitual offender, the applicable punishment range for both of the convictions at issue in this case was elevated to imprisonment for life or for any term of not more than ninety-nine years or less than twenty-five years. TEX. PENAL CODE ANN. § 12.42(d) (West Supp. 2013). Accordingly, Appellant's 25-year sentences were within the statutory range of punishment and were, in fact, the minimum sentence of imprisonment for each offense.

A narrow exception to the general rule is recognized when the sentence is grossly disproportionate to the offense. *Harmelin v. Michigan*, 501 U.S. 957, 1004–05 (1991) (Kennedy, J., concurring); *Solem v. Helm*, 463 U.S. 277, 290–92 (1983); *Dale*, 170 S.W.3d at 799. In such cases, the sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Solem*, 463 U.S. at 290; *Diaz-Galvan v. State*, 942 S.W.2d 185, 186 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). Thus, a prohibition against grossly disproportionate punishment survives under the Federal Constitution apart from any consideration of whether the punishment assessed is within the statute's range. *Delacruz v. State*, 167 S.W.3d 904, 906 (Tex. App.—Texarkana 2005, no pet.). However, "[o]utside the context of capital punishment, *successful* challenges to the

proportionality of particular sentences [will be] exceedingly rare." *Solem*, 463 U.S. at 289–90 (alterations in original) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).

In considering a claim that a sentence is disproportionate, we first make a threshold comparison of the gravity of an appellant's offense against the severity of his or her sentence. *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992); *Dale*, 170 S.W.3d at 799–800. We consider the gravity of the offense in light of the harm caused or threatened to the victim or society and the culpability of the offender. *Solem*, 463 U.S. at 292; *Dale*, 170 S.W.3d at 800. We also consider the sentence imposed in light of the offender's prior adjudicated and unadjudicated offenses. *Culton v. State*, 95 S.W.3d 401, 403 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see McGruder*, 954 F.2d at 316. Only if we infer that the sentence is grossly disproportionate to the offense will we then compare the sentence received to sentences imposed for similar crimes in Texas and sentences imposed for the same crime in other jurisdictions. *McGruder*, 954 F.2d at 316; *Dale*, 170 S.W.3d at 800.

As noted previously, Appellant complains that his punishment was excessive because it was stacked on top of the punishment he received for a prior conviction in Callahan County for the manufacture of methamphetamine in an amount between 200 and 400 grams. *See Sanders v. State*, No. 11-11-00289-CR, 2013 WL 5892010 (Tex. App.—Eastland Oct. 31, 2013, pet. ref'd) (mem. op., not designated for publication). We review a trial court's decision to cumulate, or "stack," sentences for abuse of discretion. *See Nicholas v. State*, 56 S.W.3d 760, 765 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Under TEX. CODE CRIM. PROC. ANN. art. 42.08(a) (West Supp. 2013), the trial judge has the discretion to cumulate the sentences for two or more convictions. A trial court abuses its discretion when it imposes a sentence that is not in compliance with the law. *See Nicholas*, 56

S.W.3d at 765. "In short, so long as the law authorizes the imposition of cumulative sentences, a trial judge has absolute discretion to stack sentences." *Id.*

Appellant's excessive punishment contention focuses primarily on the total length of confinement. It fails to compare the sentences to the gravity of the offenses. The instant underlying offenses and the Callahan County offense involved activities directly related to the manufacture and delivery of methamphetamine rather than mere possession. Additionally, the offenses involved very large amounts of methamphetamine. These are very serious offenses as evidenced by the lengthy punishment ranges established by the Texas Legislature for these offenses.

We also note that Appellant has an extensive criminal history that we may consider in determining whether his sentence is grossly disproportionate to his crime. *See Davis v. State*, 119 S.W.3d 359, 363 (Tex. App.—Waco 2003, pet. ref'd). In addition to the two convictions resulting from this case and the conviction out of Callahan County, Appellant's criminal history includes three convictions for burglary of a habitation, a conviction for burglary of a building, a conviction for possession of a prohibited weapon, a conviction for possession of cocaine, and a conviction for possession of a controlled substance.

Additionally, Appellant contends that the sentences should run concurrently with the Callahan County sentence because the conduct at issue in the Callahan County case occurred near the same time as the conduct at issue in this appeal. However, this argument overlooks the fact that the sentences are for separate offenses occurring on separate dates and in different counties.

Considering the nature of Appellant's offenses and his criminal history, we conclude that his sentences were not grossly disproportionate to the offenses. Because we have concluded that the sentences were not grossly disproportionate to the offenses, we do not compare Appellant's sentences to Bardwell's sentence or

any other sentences imposed for similar crimes in Texas and sentences imposed for the same crime in other jurisdictions. *McGruder*, 954 F.2d at 316; *Dale*, 170 S.W.3d at 800. We overrule Appellant's third issue.

*This Court's Ruling*

We affirm the judgments of the trial court.


JOHN M. BAILEY

JUSTICE


August 7, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.