**Opinion issued August 14, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-13-00688-CR**

———————————

**HEATH ALAN BISHOP, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1382023**

## MEMORANDUM OPINION

A jury convicted appellant Heath Alan Bishop of aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. § 22.02(a) (West Supp. 2013). The jury found true the enhancement allegations that Bishop previously was convicted of the felony offenses of forgery and aggravated robbery, and it assessed

punishment at 50 years in prison. Bishop appeals, contending that the evidence is legally insufficient to support his conviction and that the trial court erred with regard to two evidentiary rulings, excluding extraneous-offense evidence pertaining to the complainant and admitting an ice pick used in the commission of the crime.

We affirm.

## Background

When complainant C.L. was 12 years old, he left home and joined a gang. By the time he was 14 years old, he was living alone in an apartment, which was leased by a more senior gang member, and he was selling drugs from that location. C.L. used a video monitor to watch as people approached from outside the apartment. He sold only to people he knew or trusted, and he held a loaded gun while making drug transactions. He said he sold the drugs near the threshold of the apartment, and it was not his habit to allow anyone inside. C.L. was acquainted with Bishop, who had purchased crack cocaine from him in this manner.

One night, Bishop came to the apartment to buy crack. Although he had drugs available, C.L. told Bishop he had none to sell. Nevertheless he allowed Bishop inside to use the bathroom. Shortly thereafter, C.L. felt a tap on his back or shoulder, and Bishop began stabbing him in the chest and face with an ice pick,

eventually stabbing it through his eye and into his brain. The ice pick became stuck in his skull. C.L. blacked out, and Bishop left.

Eric Fitzpatrick came to the apartment, found C.L., and called 9-1-1 to report a possible shooting. It was either late on March 16 or just past midnight on March 17. Houston Police Department Officer R. De La Cruz was among the first responders. He testified that C.L. was "covered with blood," "in agony," "begging for help," and "had his eye shut." He testified that some of the blood appeared fresh. Likewise, blood was spattered throughout the apartment—on the floor, in the hallway, on the bedroom door, and in the kitchen. An empty bottle of "Oxygen Power" stain remover solution was found in the kitchen sink.

C.L. was taken to the hospital, where he stayed for about a month. He underwent brain and back surgeries, and he permanently lost vision in his right eye. He also suffered from headaches and had difficulty speaking.

On the night of the assault on C.L., Bishop called his friend, L. Lozada and asked her to meet him at a motel where they sometimes went to talk and use drugs together. Lozada was acquainted with C.L. because she had previously accompanied Bishop to his apartment to buy drugs. Bishop told her that he had fought with C.L. and stabbed him multiple times with an ice pick, including stabbing him in the eye. He also said that he believed he had killed C.L. and that he had used a chemical cleaning solution to remove blood stains from the scene.

3

Lozada noticed that Bishop had more money with him than he usually carried, and he had a salt shaker that C.L. used to store and conceal crack cocaine.

When Lozada returned home, she told her mother that Bishop had confessed to her that he had killed a person. Her mother encouraged her to make a police report, which she did. A patrol officer responded and forwarded the information to one of the investigators on the case, HPD Sergeant K. Gibbs, who interviewed Lozada. Gibbs later testified that Lozada was unusually nervous during the interview because she was "afraid of the suspect herself," and because of that, she permitted the patrol officer who had initially responded and Lozada's mother to be present, but silent, during the interview. Based on this interview, Gibbs prepared and presented a photographic lineup, from which Lozada identified Bishop.

Although Lozada was a drug user, Gibbs did not attribute her nervous behavior to withdrawal from narcotic drugs, but rather to her "extreme nervousness and anxiousness" about talking to the police. Lozada fell asleep during the interview, but Gibbs attributed that to her lack of sleep the night before.

HPD Detective T. Tyler and Sgt. K. Tolls were also investigating the incident. Tyler testified that he responded to the incident in the early morning on March 17. In addition to collecting photographic evidence of the scene of the crime, he spoke with a downstairs neighbor who said that he saw 18 people come and go from C.L.'s apartment in the two days prior to the stabbing.

4

Tyler and Tolls saw C.L. at the hospital twice. During the first visit, they observed that C.L was severely injured with stab wounds to his chest and both eyes, which affected his vision. They photographed his injuries, and those pictures were introduced into evidence at trial. C.L. was not talkative or forthcoming about the assault. Approximately 12 days after the attack, they visited C.L. a second time and showed him a photographic lineup, from which he immediately identified Bishop as the person who had stabbed him.

Tolls received an ice pick at the hospital from a person who said it was removed from C.L.'s head. He testified that when used in the manner as it was used in this case, an ice pick is a deadly weapon. At trial, Bishop objected to the admission of the ice pick on the grounds that the chain of custody had not been established. The State argued that the ice pick was retrieved from the hospital, checked into evidence, and remained sealed until opened on the day of trial. The trial court overruled Bishop's objection and admitted the ice pick into evidence.

In addition to interviewing C.L. at the hospital, Tyler and Tolls also spoke twice to Bishop, once close in time to the assault and again about 12 days later. Bishop denied any involvement. By the second meeting Bishop had changed his appearance by shaving his head and goatee.

C.L. testified at trial. He revealed that he was in juvenile detention for violating probation on a charge of delivery of a controlled substance. He admitted

that he had been a member of the Puro Vato Locos gang since he was 12 years old and that he had been selling drugs for the gang. C.L. did not identify Bishop at trial, however, he pointed out that the reason he did not recognize Bishop may have been that Bishop had short hair at trial and long hair around the time of the stabbing. C.L. testified that although he did not see Bishop stab him, he was the only other person inside the apartment with him at that time. C.L. testified that Bishop's brother was at the front door at the time of the stabbing, and he watched the brother until he blacked out. On cross-examination, C.L. agreed that Bishop's brother might have participated in the attack as well. C.L. testified that he believed Bishop took an amount of crack cocaine worth about $700.

Bishop's attorney sought to impeach C.L. with extraneous-offense evidence, but the court admonished him multiple times that it was improper to ask questions about his prior acts of misconduct. Thus Bishop's attorney was not permitted to ask such questions, and when given an opportunity to make a record, he summarized the questions that he would have asked C.L. about prior gang activity and drug sales on the night of the assault. Bishop's attorney had previously explained that he wanted to ask questions about drug sales to establish a timeline of what happened that night so that he could argue that another person was the culprit, but when making a record of the questions he wished to ask, he did not

explain how the answers might be relevant. He also did not state what answers he expected C.L. to give in response to the questions.

Bishop's defensive theory was misidentification. The evidence that C.L. had been stabbed and seriously injured was undisputed at trial, but Bishop's theory was that he was not the assailant. To that end, Bishop presented several alibi witnesses, including his mother and two family friends. His mother testified that Bishop was working as a waiter for a catering business at that time and that she had driven him to and from work on the night of March 16. She said that after work, she drove him to a friend's house. Bishop's two friends testified that they were at the house when his mother dropped him off around midnight on March 17, he was wearing his work uniform when he arrived, and he remained with them through the early or late morning hours of March 17.

In closing, Bishop argued that the State's witnesses were unreliable due to their history of drug use, addiction, and criminal activity, that C.L. had not identified Bishop in open court, and that "there are plenty of other viable candidates who could have done this roaming the streets out there." He also emphasized that C.L. was "a crack dealer," had been convicted of manufacturing and delivery of a controlled substance, "may be in the penitentiary in not too long," and had "put himself in the crack business, the gang business and the violence business." In addition, Bishop's attorney asserted that Lozada was not credible

because she was addicted to drugs and had previously been convicted of making a false report to a police officer. He also argued that the assailant may have been a member of C.L.'s gang or a rival gang, but he did not mention the alibi evidence.

The State emphasized C.L.'s out-of-court identification of Bishop as the assailant; Bishop's confession to Lozada and the evidence that corroborated her report to the police; and the alibi witnesses' interest in the outcome of the trial as compared to Lozada's disinterested position.

The jury found Bishop guilty of aggravated assault with a deadly weapon and assessed punishment. Bishop appealed.

## Analysis

### I. Sufficiency of the evidence

In his first issue, Bishop argues that the evidence was legally insufficient to support the jury's verdict because neither C.L. nor Lozada were credible witnesses, he presented some evidence of an alibi, and no physical evidence connected him to the crime.

When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). The standard is

the same for both direct and circumstantial evidence cases. *Carrizales v. State*, 414 S.W.3d at 742; *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this is the function of the trier of fact. *See Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *Wiley v. State*, 388 S.W.3d 807, 813 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

Under the Texas Penal Code, a person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another," TEX. PENAL CODE ANN. § 22.01(a)(1), and he commits aggravated assault if he "causes serious bodily injury" or "uses or exhibits a deadly weapon during the commission of [an] assault." *Id.* § 22.02(a). "A weapon can be deadly by design or use." *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (citing TEX. PENAL CODE ANN. § 1.07(a)(17)). An object is a deadly weapon if "in the manner of its use" it "is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

There was no dispute that C.L. was stabbed multiple times with an ice pick, that the ice pick was a deadly weapon, and that serious bodily injury resulted. However Bishop contends that some other person committed the assault. At trial

9

both Detective Tyler and Sgt. Tolls testified that C.L. identified Bishop as the assailant in a photographic lineup that they showed him approximately two weeks after the assault while he recovered in the hospital. C.L. testified that at the time of the assault Bishop was the only other person inside the apartment. Lozada testified that Bishop had confessed to her that he had stabbed C.L. at his apartment with an ice pick in the eye and attempted to clean up the blood stains with a chemical cleaner. Other evidence corroborated her report to the police: C.L. was found in his apartment with multiple stab wounds, an ice pick lodged in his eye and skull, and an empty bottle of stain remover was found in the kitchen sink. In addition, Lozada testified that Bishop was in possession of the salt shaker C.L. used to store and conceal crack cocaine.

Bishop argues that C.L. and Lozada were not credible and that the jury should have believed his alibi witnesses instead. However, the jury is the sole decision-maker when it comes to assessing the credibility of the witnesses. *See Adames*, 353 S.W.3d at 860; *Wiley*, 388 S.W.3d at 813. Just as a jury's reliance on the testimony of a modern-day Cretan Liar may be legally sufficient to support its verdict, so may a jury rely on testimony from witnesses who concede that they have been addicted to drugs or have previously been convicted of crimes. *See Goodman v. State*, 66 S.W.3d 283, 285–86 nn.3–5 (Tex. Crim. App. 2001) (explaining the semantical paradox of the Cretan Liar and applying it to a review

of the sufficiency of the evidence). Indeed, corroborating evidence—such as Lozada's observation that Bishop had C.L.'s salt shaker, the presence of the empty bottle of stain remover in the kitchen sink, and C.L.'s testimony that Bishop was the only other person in the apartment at the time that he was stabbed—supports the jury's assessment that C.L. and Lozada were credible witnesses. Finally, Bishop asserts that there is no DNA or fingerprint evidence to connect him to the crime and that the lack of physical evidence makes the jury's reliance on testimony from C.L. and Lozada even more suspect. Viewing the evidence in its totality, however, we hold that the jury's credibility determination was rational without this additional evidence. *See Goodman*, 66 S.W.3d at 286 n.4.

Having reviewed the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Bishop intentionally, knowingly, or recklessly caused C.L. serious bodily injury by stabbing him multiple times with an ice pick, which left him with permanent vision loss and disfiguring scars. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Carrizales*, 414 S.W.3d at 742. Accordingly, we hold that the evidence is legally sufficient, and we overrule Bishop's first issue.

## II.     Exclusion of extraneous-offense evidence

In his second issue, Bishop argues that the trial court erred by preventing him from cross-examining C.L. "about his drug selling and other activities for the

11

Puro Vato Locos gang, crack cocaine sales to people on the day of his stabbing, and whether he bartered drugs for sex" because his answers to these questions "would have shown his motive and bias to blame [Bishop] for the stabbing instead of his gang or Lozada."

Bishop challenges the trial court's rulings sustaining objections to four questions he posed to C.L. on cross-examination. He asked, "[W]hat other things have you done for Puro Vato Locos besides sell drugs?" The State objected on the grounds of relevance, Bishop offered no reply or argument, and the trial court sustained the objection. Next, he asked if C.L. had committed murder for his gang, obtaining an answer despite the court's ruling on the State's objection:

| Defense Counsel: | Have you ever done any murders with the Puro Vato Locos? |
|---|---|
| State: | Objection, Your Honor. |
| Court: | Sustained. Approach the bench, please. |
| C.L.: | No, I haven't. |

Bishop's counsel asked C.L. if "the Vato Locos bring [him] drugs" and if he had ever gotten sex in exchange for drugs, and the trial court sustained objections on the grounds of relevance.

At trial, Bishop's counsel repeatedly questioned C.L. about specific instances of conduct, mainly relating to his involvement with the Puro Vato Locos gang. Many times the court admonished him that such questioning was improper

12

and advised him that he would be permitted to make a record later. During one such colloquy, Bishop's counsel explained why he sought to ask C.L. about other drug sales on the day of the assault:

| | |
|---|---|
| Defense counsel: | My next question to [C.L.] is going to be how many people came by and bought crack cocaine that day. |
| Court: | His other drug deals are not relevant to this offense. You cannot ask about other specific acts of conduct. That is not permitted. |
| Defense counsel: | That negates—that could negate all kinds of defensive issues that don't just go towards— |
| Court: | You can ask about other people that came to his apartment. You cannot ask about whether he sold drugs to them. Do you see the difference? |
| Defense counsel: | I see the difference, but it's providing him with blanket immunity. |
| | . . . . |
| | I'm not trying to impeach his credibility necessarily with those acts. I'm trying to establish a time line, a chronology of what happened that evening. Even conceivably under the Judge's ruling, I would not be able to ask any questions about Mr. Bishop because there was a drug deal going on there. |
| Court: | No. You're permitted to ask—those are context—that's part of the crime, right? That's part of what was happening. That's part of how they were in contact together. Are you saying that you don't want to ask about prior sales to Mr. Bishop? |

Defense counsel:   No. It's that—one of our defensive theories, perhaps, is that somebody else might have done this.

Court:   Right. You can ask about that. You can ask who else came. You can say somebody else might have done this. I think you've done that and I think you're doing that. But you cannot ask this witness about other crimes that he's committed that are uncharged or unconvicted. Okay? So you can ask your questions and you can—you can present your defense, but you've got to stay within the Rules of Evidence.

Later, the court permitted him to make a record pertaining to the excluded evidence, and Bishop's counsel stated:

> I would have asked [C.L.] if he had sold crack cocaine that evening to different individuals or anyone. I would have asked [C.L.] how many individuals he sold crack cocaine to that evening. I would have asked [C.L.] how much crack cocaine he sold, who these individuals were. Additionally, I might have asked [C.L.] questions about gang activity. I might have asked [C.L.] if he had done things for the gang, criminal acts or noncriminal acts, extraneous offenses, that he did for the gang. That's all I can think of right at the moment.

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). Error may not be predicated on a ruling excluding evidence unless it affects a substantial right and the substance of the evidence was made known to the court by offer, or was apparent from the context within which

14

questions were asked. TEX. R. EVID. 103; *see Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). When a trial court denies a defendant the right to elicit specific responses from a witness, to preserve error he must make a record of the specific questions he would have asked and the expected answers to those questions. *Ho v. State*, 171 S.W.3d 295, 304 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). However, when a defendant is denied an opportunity to inquire about an entire subject matter that may have impeached the witness's credibility—such as evidence showing malice, ill will, motive, or bias—it is sufficient for the defendant to make a record of the subjects upon which he wished to question the witness. *Id.*

Specific instances of conduct may not be used to impeach a witness's credibility, except insofar as the witness may have been previously convicted of a felony or crime of moral turpitude, and in accordance with the Rules of Evidence. *See* TEX. R. EVID. 608(b) & 609. Rule 404 prohibits the admission of evidence of a person's character or character trait for the purpose of proving action in conformity therewith. TEX. R. EVID. 404(a). "However, the rules of evidence do permit a witness to be cross-examined on specific instances of conduct when they are used to establish his specific bias, self-interest, or motive for testifying." *Hammer v. State*, 296 S.W.3d 555, 563 (Tex. Crim. App. 2009). Evidence of "other crimes, wrongs or acts" may be "admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b). But when the proponent seeks to use evidence of other crimes, wrongs, or acts to show that the witness is biased or has some motive for testifying against the defendant, the proponent must show that the extraneous-offense evidence is relevant by "demonstrating that a nexus, or logical connection exists between the witness's testimony and the witness's potential motive to testify in favor of the other party." *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004). Such a motive may be shown, for example, when a witness has been indicted or is on community supervision and "is placed in a vulnerable position and may have a motive to testify in favor of the State." *Id.*

In the trial court, Bishop argued that the extraneous-offense evidence was necessary to establish a timeline and to advance the defensive theory of misidentification, i.e., that someone else committed the assault. On appeal, Bishop argues that the extraneous-offense evidence was admissible for a non-character conformity purpose such as to show that C.L. was biased or had a motive to lie. In addition—except as to the question about whether C.L. had committed murder for the gang, to which he answered "no"—there is no record as to what testimony Bishop expected C.L. to give in response to the excluded questions. Nothing in the record shows how C.L.'s testimony would have been relevant to show that he was biased against Bishop or motivated to lie for the State.

To the extent that Bishop may have intended to show that C.L. was not credible because he was biased or had a motive to lie in order to hide the identity of other drug clients or protect others, his offer of proof would be sufficient to preserve that complaint. *See Ho*, 171 S.W.3d at 304. However, the "trial court maintains broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence." *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). The general area of inquiry that Bishop identified on the record was C.L.'s gang activity and the volume of drug sales he made from the apartment. The record includes evidence that C.L. had been a gang member since he was 12 years old, engaged in illegal drug sales, and protected himself with a loaded gun while doing so. Detective Tyler testified that a neighbor reported seeing as many as 18 people come and go from C.L.'s apartment in the two days preceding the stabbing. Evidence pertaining to Bishop's desired area of inquiry had already been properly admitted, and the trial court would not have erred by excluding this cumulative cross-examination evidence. *See id.*

We hold that the trial court did not abuse its discretion by excluding this evidence, and we overrule this issue.

### III. Admission of the ice pick

In his third issue, Bishop argues that the trial court erred by admitting the ice pick into evidence because the State did not establish a proper chain of custody. As with the previous evidentiary issue, we review the trial court's ruling admitting this evidence for an abuse of discretion. *See Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

Generally, all relevant evidence is admissible. TEX. R. EVID. 402. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. When determining if proffered evidence is relevant, the court must consider whether there is a logical connection between the evidence and the proposition sought to be proved. *Layton*, 280 S.W.3d at 240. In the absence of evidence of tampering or alteration, proof of the beginning and end of the chain of custody will generally support admission of the evidence. *See Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989), *disapproved of on other grounds by Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998). "Absent evidence of tampering, issues regarding the chain of custody bear on the weight, rather than on the admissibility, of evidence." *Davis v. State*, 313 S.W.3d 317, 348 (Tex. Crim. App. 2010); *see McGregor v. State*, 394 S.W.3d 90, 126 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).

Bishop argues that the State failed to show the beginning of the chain of custody because it did not present a witness from the hospital. However, medical records that were introduced without objection indicated that an ice pick was lodged in C.L.'s skull when he was admitted to the hospital. Further, Sgt. Tolls testified, also without objection, that he received the ice pick at the hospital from a person who said it had been removed from C.L.'s head. There was no evidence of tampering in this case. Because there was proof of the beginning and the end of the chain of custody, we hold that the trial court correctly admitted the ice pick. *See Stoker*, 788 S.W.2d at 10. We overrule this issue.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).